MARÍA TERESA RODRÍGUEZ CRESPO, ETC., demandantes y recurrentes, *v.* DR. CÉSAR HERNÁNDEZ y la SOCIEDAD PROFESIONAL, ETC., demandados y recurridos.

*Número:* R-84-463     *Resuelto:* 17 de junio de 1988

---

640

*Etienne Totti Del Valle*, de *Domínguez & Totti*, y *Héctor Alvarado Tizol*, de *Alvarado Tizol & Walker Merino*, abogados de los recurrentes; *Ángel R. De Corral Juliá*, de *De Corral & De Mier*, abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR ALONSO ALONSO emitió la opinión del Tribunal.

En nuestra función revisora no somos un tribunal de peritos médicos, aunque tengamos que pasar juicio sobre prueba pericial médica. Tal enfoque de nuestra función no constituye una abdicación de la misma, sino una reafirmación de los parámetros y deslindes que hemos establecido entre las funciones de este Tribunal, la de los tribunales de instancia, el peritaje médico y la naturaleza y función judicial.

El 22 de octubre de 1984 la recurrente, María Teresa Rodríguez Crespo, por sí y en representación de su hijo menor, presentó ante este Tribunal solicitud de revisión contra la

sentencia del Tribunal Superior, Sala de San Juan, la cual concluyó que el demandado recurrido, Dr. César Hernández, no había incurrido en negligencia durante la intervención quirúrgica de la demandante recurrente así como durante el transcurso del tratamiento post operatorio.

Los seis (6) errores señalados por la recurrente en el presente recurso pueden sintetizarse en tres (3): (1) errónea apreciación de la prueba sobre negligencia y relación causal; (2) récord médicos inadecuados, y (3) no haber mediado un consentimiento informado, puesto que el médico demandado recurrido no le advirtió a la paciente sobre el posible riesgo de que durante la operación se pudiera lesionar el uréter y la probabilidad de que perdiera un riñón.

I

*Los hechos*

La demandante recurrente, María Teresa Rodríguez Crespo, visitó las oficinas del grupo ginecológico compuesto por los doctores Figueroa Longo, Comas, Catasús y Hernández durante el mes de enero de 1979, con el propósito de someterse a un exámen ginecológico general.

La demandante recurrente regresó a la oficina del grupo médico el 9 de julio de 1979. En dicha ocasión se quejó de la presencia de dolores fuertes en el lado derecho del bajo vientre. El Dr. César Hernández procedió a realizarle un exámen pélvico, luego del cual le señaló que tenía un problema en su ovario derecho y le ordenó que se hiciera un sonograma[1] y un pielograma intravenoso (I.V.P.).[2] El médico también le indicó a la señora Rodríguez que su impresión inicial era que

---

[1] Despliegue pictórico de ultrasonido de las estructuras anatómicas. *Gould Medical Dictionary*, 4ta ed., Nueva York, Ed. McGraw-Hill, 1979, págs. 423, 1268.

[2] Prueba de rayos X de la pelvis renal. *Diccionario Terminológico de Ciencias Médicas*, 8va ed., Barcelona, Ed. Salvat Editores, 1963, pág. 937.

ella padecía de una condición resultante de la extirpación, previamente realizada, del ovario y tubo uterino izquierdo.

La señora Rodríguez había sufrido anteriormente dos (2) intervenciones quirúrgicas. En la primera de ellas, realizada durante el 1973, se le había extirpado el apéndice y, en la segunda, se le extirpó el ovario y tubo uterino izquierdo.

Cuando la demandante recurrente regresó a la oficina del doctor Hernández con los resultados de los exámenes que se habían realizado, éste le confirmó su diagnóstico inicial y le recomendó la remoción quirúrgica del tubo y ovario derechos, toda vez que de los exámenes se desprendía que ella tenía una masa sólida cuya medida alcanzaba aproximadamente unos 4 cm., y la cual estaba localizada en el área circundante a dicho ovario.

El doctor Hernández le explicó a la demandante recurrente que el tratamiento para esa condición era de tipo quirúrgico y, entonces, procedió a discutir la naturaleza de la operación, así como los "pros" y los "contras" de la misma. Así lo determinó específicamente el tribunal de instancia.

Dicho tribunal concluyó, además, que la señora Rodríguez, quien había cursado estudios universitarios y trabajaba como contable en un bufete de abogados, había sido sometida anteriormente a dos (2) intervenciones quirúrgicas (una de ellas similar a la presente) y había entendido adecuadamente las explicaciones que el doctor Hernández le ofreció sobre el procedimiento operatorio al que iba a ser sometida.

Surge de los autos que la demandante recurrente fue admitida al Hospital Auxilio Mutuo el 23 de julio de 1979, bajo los servicios del grupo ginecológico Figueroa Longo, Comas, Catasús & Hernández. Una vez ingresa al hospital, se le realizó una serie de pruebas de laboratorio, las cuales habían sido ordenadas con anterioridad por el doctor Hernández.

El 24 de julio de 1979, la demandante recurrente fue llevada a la sala de operaciones, donde el doctor Hernández le

practicó la intervención quirúrgica para la remoción del tubo y ovario derechos.

Una vez que comenzó la operación, el médico procedió a identificar las estructuras anatómicas correspondientes. La identificación del uréter,(3) en particular, la realizó mediante palpación y visualización.

El doctor Hernández encontró en el área del tubo y del ovario derechos la presencia de múltiples adherencias, inflamación y tejido fibroso.

Durante la intervención, se produjo un sangramiento en el área en que el ovario y el tubo se habían adherido a la pared posterior de la membrana que cubre la superficie interior del vientre,(4) esto como consecuencia de la presencia anormal de vasos sanguíneos en el área. Al no cesar el sangramiento mediante compresión, el doctor Hernández colocó varios puntos de sutura en la membrana que cubre el vientre para lograr contener la hemorragia de los vasos sangrantes.

El médico demandado recurrido atestó que, durante el proceso de colocación de suturas, mantuvo al uréter derecho bajo su observación directa y ejerció sumo cuidado para no lastimarlo. De la misma manera, mantuvo al uréter bajo observación cuando procedió a unir la pared posterior de la membrana que cubre el vientre.

Luego de que concluyera el proceso de colocación de suturas, el doctor Hernández palpó y visualizó nuevamente el uréter, examinó que no hubiera alguna salida de orina y optó entonces por no realizar ningún procedimiento adicional.

Una vez que concluyó la operación, la señora Rodríguez fue trasladada a la sala de recuperación donde las enfermeras comenzaron a medir y a anotar en el récord médico el

---

(3) Conducto par que lleva la orina desde el riñón a la vejiga. *Diccionario Terminológico de Ciencias Médicas, op. cit.*, pág. 1215.

(4) Peritoneo. *Diccionario Terminológico de Ciencias Médicas, op. cit.*, pág. 929.

volumen de líquidos administrados a la paciente, el volumen de orina descargada por ésta, así como las observaciones sobre su condición y recuperación.

De los récord post operatorios surge que a la señora Rodríguez se le habían administrado desde las 12:00 del mediodía de 24 de julio, día en que fue operada, hasta las 7:00 A.M. de 25 de julio de 1979, unos 3,800 cc. de suero, y que durante ese mismo período había eliminado unos 2,000 cc. de orina. El único *perito de la demandante recurrente* (doctor Tortora) testificó que esa cantidad de orina era la adecuada y que, frente a ese dato, *no sospecharía* la presencia de una lesión al uréter. T.E. II, pág. 66. *Tal opinión fue confirmada* por los peritos del demandado recurrido que declararon ante el Tribunal Superior.

En cuanto a la condición y el proceso de recuperación de la paciente, durante el 24 de julio de 1979 la demandante recurrente se quejó de dolor. Las enfermeras procedieron a administrarle medicamentos para eliminarle el mismo.

Durante el 25 de julio de 1979, la demandante recurrente se quejó nuevamente de dolor. Esa mañana fue visitada por el doctor Hernández quien, luego de hablar con ella y de examinarla, anotó en el récord que notaba a la paciente febril. Así mismo anotó que la paciente sentía dolor de garganta, pero que su descarga de orina era normal, que los pulmones estaban claros y que la paciente no había formulado ninguna otra queja en particular.

En el transcurso del turno de la tarde de 25 de julio, la señora Rodríguez le señaló a una de las enfermeras que tenía dolor y fiebre. La enfermera le tomó la temperatura y por *primera vez* observa que la paciente registra 38.5 grados de fiebre; ese nivel bajó a los 37.5 grados a eso de las 8:00 P.M.

Durante la mañana de 26 de julio de 1979, la paciente continuó febril. Esa mañana volvió a recibir la visita del doctor Hernández quien, sospechando que la fiebre podía tener origen respiratorio, le recetó un antibiótico. En la mañana de

27 de julio de 1979, nuevamente la paciente se observa febril. Esa mañana fue visitada por el doctor Catasús, quien estaba de guardia por el grupo ginecológico ese día. La señora Rodríguez le señaló que sentía dolor en su costado derecho y el médico, luego de examinarla, encontró que presentaba por *vez primera* sensibilidad en el área de las vértebras y costado derecho. Ante ese hallazgo, el doctor solicitó una consulta con el urólogo, doctor Acosta Otero.

Surge del récord médico que fue durante la mañana de 27 de julio de 1979 cuando la paciente se quejó por *primera vez* de dolor en su costado derecho. Esa fue precisamente la fecha en que se *consultó de inmediato* a un urólogo para la comprobación de que no existiese una obstrucción en el uréter.

Durante la tarde de 27 de julio de 1979, el doctor Acosta sometió a la demandante recurrente a una citoscopía[5] en la que confirmó la obstrucción del uréter derecho. Al día siguiente el médico sometió a la señora Rodríguez a una segunda operación exploratoria en la que le liberó el uréter derecho. Ello fue posible al liberar del área cierto tejido inflamado, así como varias suturas en el mismo. Luego de la operación se restableció el flujo normal de orina a través de dicho uréter y el médico pudo pasarle unas sondas ureterales.

El Dr. Manuel De Jesús, patólogo que examinó los tejidos extraídos a la demandante recurrente por el doctor Acosta durante la intervención de 28 de julio de 1979, los describió como dos (2) fragmentos irregulares de tejido marrón grisáceo, blando y gomoso con material de sutura adherido y cuya medida era de 3 x 2 x 1 cm. T.E. II, pág. 446.

---

[5] Examen y numeración comparativa de los elementos celulares contenidos en los líquidos serosos. *Diccionario Terminológico de Ciencias Médicas, op. cit.*, pág. 248.

La demandante recurrente estuvo hospitalizada hasta el 3 de agosto de 1979, fecha en que fue dada de alta, pero con posterioridad a ese momento se mantuvo asistiendo a citas de seguimiento médico.

La señora Rodríguez presentó nuevamente síntomas de que el uréter estuviese obstruido el 7 de septiembre de 1979, casi un mes despúes de haber sido dada de alta, por lo que tuvo que ser hospitalizada. El doctor Acosta le realizó otra citoscopía el 14 de septiembre de 1979, y el 19 de ese mes la sometió a una cirujía del uréter dirigida a corregir la obstrucción. En el transcurso de la conversación habida entre la demandante recurrente y el doctor Acosta, éste le indicó que existía la posibilidad de que perdiera su riñón derecho. T.E. I, pág. 38.

Una vez que a la demandante recurrente se le realizó la cirugía del uréter para corregir la obstrucción, se le dió de alta. No obstante, el 21 de octubre tuvo que volver a ser hospitalizada. En esa ocasión el urólogo, doctor Acosta, encontró que el uréter estaba en buenas condiciones, pero que el riñón derecho de la señora Rodríguez se encontraba muy debilitado.

Finalmente, el doctor Acosta tuvo que extirparle a la demandante su riñón derecho el 31 de octubre de 1979.

Se hace patente que la señora Rodríguez no presentó objeción al tratamiento que se le ofreció, *no solicitó* información adicional sobre el mismo ni expresó deseo o intención de *consultar* a otros médicos. Como veremos más adelante, *consintió* incluso por escrito al tratamiento al que se le sometió.

## II

*Las normas doctrinales aplicables*

■ Conforme a la norma mínima de cuidado médico exigible legalmente en casos de impericia médica en Puerto

Rico, se espera que el médico ofrezca a su paciente aquella atención médica que, a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y práctica prevalecientes en la medicina, satisface las exigencias generalmente reconocidas por la propia profesión médica. *Medina Santiago v. Veléz*, 120 D.P.R. 380 (1988); *Pérez Torres v. Bladuell Ramos*, 120 D.P.R. 295 (1988); *Ríos Ruiz v. Mark*, 119 D.P.R. 816 (1987); *Riley v. Rodríguez de Pacheco*, 119 D.P.R. 762 (1987); *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719 (1983); *Negrón v. Municipio de San Juan*, 107 D.P.R. 375 (1978); *López v. Hosp. Presbiteriano, Inc.*, 107 D.P.R. 197 (1978); *González v. E.L.A.*, 104 D.P.R. 55 (1975); *Morales v. Hosp. Matilde Brenes*, 102 D.P.R. 188 (1974); *Oliveros v. Abréu*, 101 D.P.R. 209 (1973). H.M. Brau Del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. I, pág. 248.

■ Un error de juicio honesto y razonable en el diagnóstico y tratamiento constituye una eximente de responsabilidad cuando las autoridades médicas están en desacuerdo sobre cuál es la cura adecuada.

■ Al cumplir con nuestra función revisora en casos de impericia médica, nuestra decisión debe estar fundada en la prueba vertida en el juicio por los peritos y en la prueba documental. En ausencia de prueba no es nuestra función establecer a este nivel apelativo los elementos requeridos por el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141. De lo contrario, cedemos a la tentación de sustituir el criterio de los peritos médicos por el nuestro a base de un estudio apelativo de la literatura disponible. *Ríos Ruiz v. Mark*, supra.

■ Corresponde al demandante probar, mediante preponderancia de la prueba, que el tratamiento ofrecido por el demandado fue el factor que con mayor probabilidad oca-

sionó el daño y establecer, además, el vínculo causal requerido por el Art. 1802 del Código Civil, *supra*. *Cruz v. Centro Médico de P.R.*, supra.

■ La presunción de que el médico le administró el tratamiento adecuado a su paciente implica que le corresponde al demandante presentar evidencia suficiente para controvertir que el tratamiento fue adecuado. Ello requiere que la relación de causalidad no se establezca a base de una mera *especulación* o *conjetura*. *Sáez v. Municipio de Ponce*, 84 D.P.R. 535 (1962); *Ramos Orengo v. La Capital*, 88 D.P.R. 315 (1963).

■ La negligencia del médico, al igual que la de cualquier otra persona demandada al amparo del Art. 1802 del Codigo Civil, *supra*, no se presume por el mero hecho de que el paciente haya sufrido un daño o que el tratamiento no haya tenido éxito. Igual que en los casos ordinarios de daños y perjuicios, el demandante tiene que probar por preponderancia de la evidencia que el daño ocurrido se debió con mayores probabilidades a la negligencia que el demandante imputa.

■ Para establecer prima facie un caso de daños y perjuicios por negligencia de un médico o de un dentista, el demandante tiene que presentar prueba sobre: (1) las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o a los especialistas, y (2) la relación causal entre la actuación u omisión del facultativo y la lesión sufrida por el paciente. *Medina Santiago v. Vélez*, supra.

■ El demandante debe establecer mediante prueba pericial cuáles son los requisitos de cuidado y conocimiento científico requeridos por la profesión en el tratamiento de determinado tipo de pacientes. Esa prueba deberá demostrar cuáles son las exigencias de toda la profesión a la luz de

los conocimientos científicos disponibles mediante los medios de comunicación y programas de educación continuada, *Medina Santiago v. Vélez*, supra, así como las normas de consentimiento informado aplicables al caso y la razón por la cual el médico demandado no cumplió con las mismas.

## III

*La negligencia en la primera intervención quirúrgica*

Examinemos si el Dr. César Hernández incurrió en negligencia al intervenir quirúrgicamente a la demandante recurrente.

Un análisis cuidadoso de la transcripción de evidencia, de los récord médicos y de los autos nos mueven a concluir que el doctor Hernández no se apartó de las normas de excelencia profesional reconocidas por la profesión médica.

La tesis planteada por los recurrentes en su recurso descansa en sostener que incidió el tribunal de instancia al concluir que la obstrucción del uréter había sido causada por la presencia de tejido inflamado, que por estar ubicado alrededor del uréter gradualmente lo fue comprimiendo hasta causar la obstrucción que encontró el urólogo, doctor Acosta.

Los recurrentes sostienen que lo correcto hubiera sido concluir que un punto de sutura había causado la obstrucción en el uréter de la demandante recurrente, e imponerle responsabilidad al médico demandado recurrido por haber incurrido en negligencia durante la intervención quirúrgica.

Varios factores nos mueven a diferir de la contención de los recurrentes.

En primer lugar, lo expresado en la literatura médica apoya la posición y las actuaciones del médico demandado recurrido.

En segundo lugar, la evidencia objetiva y la prueba presentada durante el juicio, tanto testifical, documental como pericial de *ambas partes* sostienen plenamente la conclusión

del tribunal sentenciador a los efectos de que la obstrucción del uréter derecho de la demandante recurrente se produjo por la compresión causada por tejido inflamado fibroso y edematoso(6) presente en el área circundante al uréter.

## IV

A los fines de evaluar la situación fáctica ante nos, examinemos el marco médico y teórico necesario para ubicar adecuadamente la misma.

La determinación sobre si una lesión al uréter se ha debido a la negligencia de un médico o si ha sido el resultado del riesgo inherente que conlleva el procedimiento operatorio es compleja. 6 *Lawyers' Medical Cyclopedia* Sec. 44.28 (1977); M.F. Campbell y J.H. Harrison, *Urology*, Philadelphia, Ed. W.B. Saunders, 1970, Vol. I, pág. 811; L.A. Orkin, *Trauma to the Ureter: Pathogenesis and Management*, Philadelphia, Ed. F.A. Davis, 1964, pág. 137.

No existe un medio ideal para eliminar todas las complicaciones quirúrgicas serias de las que pueden desarrollarse las lesiones ureterales, por lo que el énfasis del cirujano debe dirigirse no sólo a evitar la lesión durante la operación, sino también al pronto reconocimiento de la misma. M.C. Daley, *Ureteral Injuries*, 1972 Med. Trial Tech. Q. 251, 255 (1972).

La mayoría de los casos conocidos con relación a lesiones al uréter ocurren durante las operaciones quirúrgicas ginecológicas. Orkin, *op. cit.*, pág. 137; Daley, *supra*, pág. 251. Se ha estimado que la incidencia de lesiones ureterales resultantes de intervenciones quirúrgicas ginecológicas, a raíz de *afecciones benignas*, oscila entre el .08 y 2.5%. Un informe reciente demostró que de 33,144 histerectomías realizadas en casos de afecciones benignas, solamente se informaron

---

(6) Acumulación excesiva de líquido en el tejido celular. *Diccionario Terminológico de Ciencias Médicas, op. cit.*, pág. 381.

*catorce* (14) casos de lesiones ureterales, lo cual constituye un 0.042% de los casos. En relación a casos de histerectomía radical,[7] los estudios reflejan una incidencia de daño ureteral ascendente a un 14.6%. Campbell y Harrison, *op. cit.*, págs. 811 y 814.

Otros estudios han reflejado que, en lo que respecta a procedimientos ginecológicos complejos, el promedio de lesiones ureterales oscila entre el .05 y el 2.42%. Daley, *supra*, pág. 252.

Debe señalarse que en los casos en que una histerectomía *no radical, como la realizada en el presente caso*, es realizada por un profesional competente el riesgo de que el uréter pueda ser lesionado se reduce *a menos de un uno por ciento (1%)*. *Lawyers' Medical Cyclopedia*, supra, pág. 527.

Algunos tratadistas como S.R. Weinberg sostienen que las lesiones al uréter que ocurren durante una intervención quirúrgica son inescapables aun cuando el paciente esté en las manos del médico más experimentado. L.J. Gordy y R.N. Gray, 4B *Attorney's Textbook of Medicine* Cap. 284, Sec. 284.35(3) (1986).

Toda vez que no existe un método único comprobado para la prevención de los daños ureterales, se hace indispensable que el médico se relacione con las estructuras anatómicas localizadas en el área a ser intervenida, así como de cualquier alteración anatómica que presente el paciente a ser sometido a operación. Campbell y Harrison, *op. cit.*, pág. 827.

La buena práctica de la medicina le exige al médico que vaya a operar a una paciente con una condición similar a la

---

[7] La histerectomía radical —ya sea abdominal o vaginal— consiste en la remoción del útero y la cerviz, así como de todos los tejidos circundantes; la vagina superior, y en el caso de las operaciones abdominales, de la región pélvica de los nódulos linfáticos en los lados de la pelvis. Esta operación se utiliza cuando se descubre la presencia de condiciones malignas en la cerviz y, en ocasiones, para extirpar el cáncer uterino. 5A *Lawyers' Medical Cyclopedia* Sec. 36.47 (1984).

de autos que identifique y que visualice el uréter. Este proceso de visualización y de palpación debe ser continuo durante toda la intervención quirúrgica. Campbell y Harrison, *op. cit.*, pág. 828. Cuando el campo operatorio presenta masas inflamadas o tumores, el médico debe también identificar las estructuras anatómicas, los márgenes de la vejiga y los ligamentos presentes en el área. La identificación del uréter se completa entonces con la palpación e inspección del mismo. Orkin, *op. cit.*, pág. 155.

Una vez que el médico se ha cerciorado de que no ha ocurrido una lesión en el uréter, como paso previo a cerrar el abdomen, debe inspeccionar y visualizar el uréter. También debe cerciorarse de que no exista extravasación de orina. Gordy y Gray, *supra*, pág. 248-16.

Se ha sostenido en algunos tratados médicos que el reconocimiento durante la realización de una operación de que se ha causado una lesión al uréter depende en primera instancia de la *sospecha que el cirujano* tenga sobre la posibilidad de que haya ocurrido una lesión. Campbell y Harrison, *op. cit.*, pág. 831; *Lawyers' Medical Cyclopedia*, supra, Sec. 44.28(D). Uno de los aspectos más importantes a considerar en la determinación de la lesión al uréter y la imputación de responsabilidad a un facultativo lo es el reconocimiento temprano de la lesión. Como muy correctamente señalara Charles Higgins, M.D., "[e]l pecado venial es el daño al uréter, pero el pecado mortal es la falta en reconocerlo". Gordy y Gray, *supra*; Daley, *supra*, pág. 256.

La posición general de las autoridades médicas es que un reconocimiento temprano provee las mayores oportunidades para corregir la lesión. Claro está, ello dependerá, en parte, de que la lesión sea sospechada por el médico. *Lawyers' Medical Cyclopedia*, supra. Cuanto más pequeño sea el intervalo de tiempo entre la operación y el descubrimiento de la lesión, mayor será la oportunidad de éxito en la reparación de la misma. El término adecuado para ello está compren-

dido dentro de las setenta y dos (72) horas posteriores a la operación. Orkin, *op. cit.*, pág. 245.

Una de las señales primarias que evidencian la ocurrencia de una lesión ureteral, a raíz de una operación abierta en el abdomen, es la aparición de salida de orina. P.D. Cantor, 5 *Traumatic Medicine and Surgery for the Attorney* Cap. 1216, págs. 629–630 (1961). Así también, el paciente presenta usualmente quejas de dolor en la región del riñón o del costado. C. Winter, *Nursing Care of Urology Patients*, Ed. C.W. Mosby Company, 1977, pág. 337; Cantor, *supra*, pág. 630.

El cotejo de los niveles de residuos urinarios, la presencia de infecciones en el tracto urinario y el estado de la condición renal del paciente son los mecanismos indicados durante la etapa *post operatoria* para la evaluación de la presencia de una lesión ureteral. La diligencia en el cotejo de los valores presentados en estas áreas permite un diagnóstico temprano de obstrucción y el inicio subsiguiente del proceso de tratamiento. Campbell y Harrison, *op. cit.*, pág. 830.

Los datos anteriormente expuestos nos demuestran que, frente al tipo de intervención quirúrgica a que fue sometida la señora Rodríguez, el riesgo de que ocurriera una lesión al uréter o la consecuente pérdida de un riñón no era significativo, máxime si el médico ha tomado las precauciones que le exige la buena práctica de la medicina. Por esta razón, no se requería que el doctor Hernández tomara medidas de precaución adicionales a las adoptadas por él en el caso de autos.

De la prueba presentada surge que a la demandante recurrente se le realizó, tal y como recomiendan las autoridades médicas, un pielograma intravenoso *durante el período preoperatorio*.

Una vez comenzó la intervención quirúrgica, el doctor Hernández palpó y visualizó el uréter tanto durante la etapa de resección de las estructuras anatómicas, como en la etapa

de reconstrucción y cierre del orificio dejado por la remoción de las estructuras en el peritoneo, sin confrontar dificultades en la visualización del uréter y sin que en ningún momento tuviera sospechas de haber ligado el uréter. T.E. II, págs. 141, 173–176, 179 y 267.

En lo que respecta a los procedimientos de precaución descritos por el doctor Tortora (perito de la demandante recurrente) en su testimonio, y que a su entender debieron utilizarse para comprobar que realmente el uréter no hubiese sido lesionado durante la intervención quirúrgica, el propio perito fue claro al condicionar su utilización al contexto en *que el médico tuviese sospechas* de haber lesionado o comprometido el uréter durante la cirugía.

El doctor Tortora testificó que, para propósitos de dicha comprobación, el médico debía asegurarse, en primer lugar, de no haber causado alguna lesión al uréter; en segunda instancia, debía palpar el uréter a través de su curso desde la parte superior hasta el área que penetra en la vejiga para determinar que no estaba angulado como consecuencia de la cirujía; en tercer lugar, el médico debía cerciorarse de que no existiese algún escape de orina en el área que estaba operando y, en cuarto lugar, recomendaría que se llevara a cabo la inyección del *Indigo Carmine* o que se realizara una citoscopía, pero esto cuando *hubiese duda* de que existiera algún escape de orina o alguna otra indicación de que se había afectado el uréter. T.E. I, págs. 263–266; T.E. II, págs. 11, 91–94 y 179.

Como señaláramos anteriormente, las autoridades médicas señalan que se debe mantener el uréter bajo visualización y palpación directa durante todo el transcurso del procedimiento operatorio, así como asegurarse de que no existan escapes de orina en el área que está siendo operada. Si el médico tuviera sospechas de haber ligado el uréter, entonces

sería recomendable que se realizaran otros procedimientos médicos.(8)

El doctor Hernández fue constante en atestar que se había asegurado visualmente de no haber lesionado el uréter, puesto que a través del proceso operatorio palpó constantemente el mismo (T.E. II, págs. 141, 174, 175, 179 y 267) y que se había cerciorado de que no existía salida de orina en el campo operatorio. T.E. II, pág. 175.

El demandado recurrido también fue categórico al indicar que en ningún momento tuvo sospechas de que hubiera lesionado el uréter y que ello fue la razón por la cual no había utilizado el *Indigo Carmine* o la citoscopía. T.E. II, pág. 179.

*Nada hay en el récord que dé base para sostener que el doctor Hernández, durante la operación, debió haber sospechado que había afectado el uréter.*

Una de las contenciones de la demandante recurrente en su escrito ante nos es que el testimonio del médico demandado recurrido no era confiable porque éste había admitido bajo interrogatorio que la causa de la obstrucción que impedía el funcionamiento normal del riñón derecho de María Rodríguez había sido un punto de sutura que parcialmente lo obstruyó. El demandado recurrido indicó que, al haber mencionado el punto de sutura como la causa de la obstrucción ureteral, se estaba refiriendo a que dicho material de suturas, que estaba enclavado en el área retroperitoneal, había sido el factor causal desencadenante de una reacción inflamatoria aguda del tejido circundante, el cual, conforme fue creciendo, formó las masas que fueron empujando y aprisionando el uréter hasta obstruirlo. T.E. II, págs. 334–336. Conforme a su posición, aquellos puntos que

---

(8) Entre estos procedimientos se encuentran la caterización, el pielograma intravenoso y el *Indigo Carmine*. Algunos de estos procedimientos conllevan complicaciones y riesgos que hacen que su utilización no sea mandatoria en todos los casos.

se colocan en el tejido y en la membrana que cubre al vientre constituyen un factor irritante. La sangre que infiltró el tejido junto a la grasa edomatosa formó una masa que terminó obstruyendo el uréter. T.E. II, págs. 162–163. El tribunal de instancia dirimió el asunto de la credibilidad del testimonio del demandado recurrido y no encontramos error, prejuicio o parcialidad en la apreciación de la prueba realizada por dicho tribunal.

El testimonio del doctor Hernández fue corroborado por el testimonio vertido por el urólogo doctor Acosta Otero, quien precisamente liberara la obstrucción ureteral que desarrolló la demandante recurrente. El doctor Acosta atestó *que las masas extirpadas y localizadas periureteralmente habían sido la causa próxima de la obstrucción ureteral, ya que al extraerlas se restableció completamente el flujo de orina a través del uréter.* T.E. II, págs. 445–446.

El Dr. Fernando J. Montilla, ginecólogo obstetra y perito del demandado recurrido, habiendo evaluado los récord médicos de la paciente, atestó que ésta había sido tratada de acuerdo con los mejores cánones de la ginecología y que hasta el 27 de julio de 1979 la paciente llevaba un curso post operatorio bueno, pero que desafortunadamente desarrolló una complicación que generó una obstrucción del uréter. T.E. II, págs. 347–355. El doctor expresó que el récord era claro en términos de lo que produjo la obstrucción. Concluyó que la paciente había tenido una reacción masiva a la sutura de la membrana que cubre el vientre, la cual le produjo una reacción del tejido circunuretal o periuretal que, desgraciadamente, fue de un tamaño grande, y que esa reacción inflamatoria le causó la obstrucción del uréter. *Atestó* que *no hubo* en el caso *evidencia* de *suturas* en el uréter. T.E. II, págs. 359–360.

Bajo el interrogatorio de la representación legal de los demandantes recurrentes, el médico atestó que lo que ocurrió en el caso fue una inflamación de tejidos debido al re-

chazo del cuerpo a las suturas de la membrana y la inflamación de la operación. Explicó que, al cerrarse la membrana que cubre el vientre, la masa se acumuló y comprometió el uréter. Rechazó la posibilidad de que la obstrucción se debiera a una angulación de uréter por sutura, puesto que la evidencia patológica demostró que había tejido inflamado y ello fue la causa de la obstrucción. T.E. II, págs. 361–434.

El doctor Acosta dejó establecido que, una vez que extrajo ese tejido, el uréter se desahogó, empezó a orinar como era debido y la orina empezó a fluir libremente. T.E. II, págs. 445–446.

*El testimonio del perito doctor Montilla, del doctor Hernández, del urólogo doctor Acosta y del patólogo doctor De Jesús sostiene invariablemente la tesis del demandado recurrido.* El tribunal de instancia acogió estos testimonios y no vemos razón para alterar su conclusión.

Existe abundante jurisprudencia sobre situaciones similares a las de autos en que tribunales estatales se han negado a imponer responsabilidad al médico demandado al estimar que no se probó la negligencia mediante preponderancia de la prueba, o por entender que existía un error de juicio razonable. *Hart v. Steele*, 416 S.W.2d 927 (1967); *Lince v. Monson*, 108 N.W.2d 845 (1961); *Modrzynsky v. Lust*, 88 N.E.2d 76 (1949); *Siverson v. Weber*, 372 P.2d 97 (1962); *Le Prince v. McLeod*, 179 So. 2d 856 (1965); *Block v. McVay*, 126 N.W.2d 808 (1964); Anotación, *Malpractice: Surgeon's Liability for Inadvertently Injuring Organ other than that Intended to be Operated On*, 37 A.L.R.3d 464(29b) (1971).

### El tratamiento post operatorio

El doctor Tortora, *perito de la parte demandante recurrente*, sostuvo que, a los fines de no apartarse de las normas aceptables de la medicina, debería medirse durante el tratamiento post operatorio el ingreso y egreso de líquidos de la paciente, así como atender la presencia de fiebre y dolores.

T.E. II, pág. 11; Campbell y Harrison, *op. cit.*, págs. 830–831.

Si evaluamos el recuento de los hechos ocurridos durante los días 24 al 27 de julio de 1979 encontramos que durante el primer día la paciente eliminó unos 2,000 cc. de orina, cantidad que a juicio de los peritos fue adecuada.

Durante el 25 de julio de 1979 la demandante recurrente no informó fiebre y sólo se quejó de dolor de garganta. T.E. II, pág. 83.

El 26 de julio la paciente se queja de fiebre, pero no se reflejan quejas de dolor. T.E. II, pág. 84.

Hasta ese momento la sintomatología presentada por la demandante recurrente es la típicamente esperada durante el período de recuperación de un paciente. *Tan es así que, confrontado con esos datos, el doctor Tortora tuvo que admitir que frente a ellos no sospecharía de la presencia de una lesión al uréter.* T.E. II, pág. 97.

Es el 27 de julio de 1979 que por primera vez surge una queja sobre el dolor en el "flanco derecho", *esto es, al tercer día* de realizada la operación. Una vez que el doctor Catasús conoce ese dato, *inmediatamente* obtiene una consulta con el urólogo quien procede a realizarle una citoscopía durante ese mismo día.

Como ya señaláramos, el énfasis que exige la buena práctica médica en este tipo de situación en que surge una lesión al uréter es el de reconocer prontamente el daño y ofrecer un tratamiento adecuado. Daley, *supra*, pág. 251. El tiempo ideal para ello lo es dentro de las setenta y dos (72) horas posteriores a la realización de la operación. Orkin, *op. cit.*, pág. 245. El doctor Hernández no se apartó de esa norma. Una vez que el doctor Catasús conoce durante el transcurso del 27 de julio de 1979 que puede existir una relación entre el dolor en el flanco derecho y una posible obstrucción en el uréter, procede a obtener una consulta con el urólogo. Ese mismo día se le realiza a la demandante recurrente un pielo-

grama y un cistograma(9) (T.E. II, pág. 442) y durante el 28 se le somete a operación. Luego de extraérsele el tejido del área circundante al uréter éste se vació.

El doctor Acosta afirmó que no vió nada fuera de lo normal en el área ureteral, tal como lo sería un punto de sutura (T.E. II, pág. 447) y concluyó que no había posibilidad de relación causal entre lo que ocurrió en la operación y la eventual pérdida del riñón de la demandante recurrente. T.E. II, pág. 452.

*Sobre los récord médicos*

La demandante recurrente sostiene que el doctor Hernández no hizo mención alguna en su informe operatorio sobre las medidas tomadas para identificar y revisar la condición del uréter.

Sobre el particular, el demandado recurrido señaló que no encontró nada particular que le hiciera creer que había afectado el uréter. El informe operatorio contiene, a su entender, los datos positivos o importantes que se encuentran durante la cirujía y, en este caso, no creyó importante describir esos procedimientos. T.E. II, págs. 261–262.

■ Hemos sido consistentes en cuanto a valorizar la importancia de llevar unos récord médicos adecuados. Aun cuando las omisiones en los récord médicos no necesariamente constituyen negligencia per se, dicha omisión puede ser un factor a considerarse en la credibilidad que el médico merezca respecto al tratamiento que dio al paciente. *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721 (1984); *Reyes v. Phoenix Assurance Co.*, 100 D.P.R. 871 (1972).

■ Aun cuando el médico de autos no haya sido diligente en su responsabilidad de llevar unos récord médicos

---

(9) Radiograma de la vejiga. *Diccionario Terminológico de Ciencias Médicas, op. cit.*, pág. 246.

adecuados de la primera operación, no se ha demostrado la relación causal entre el no llevarlos y la negligencia. El imputarle negligencia al demandado por ese hecho conllevaría el desviarnos de las normas esbozadas sobre ese aspecto por este Tribunal. *Pérez Cruz v. Hosp. La Concepción*, supra, pág. 732; *López v. Hosp. Presbiteriano, Inc.*, 107 D.P.R. 197 (1978).

A pesar de que el perito de la demandante recurrente, doctor Tortora, sostuvo que el demandado había incurrido en negligencia durante el tratamiento *post operatorio* de la señora Rodríguez, la realidad es que, al ser confrontado con los récord médicos de la paciente, *tuvo que aceptar la inconsistencia* de sus declaraciones con lo que en realidad dichos récord contenían. La propia sentencia del tribunal de instancia recogió algunas de ellas:

> 1. Señaló que no se había anotado en el récord de la demandante, y para el período post-operatorio inmediato, el volumen de ingreso y egreso de líquidos de ésta. Al mostrársele las páginas de récord que contenían esta información, tuvo que aceptar no sólo que se habían anotado estos datos, si[no] también que el egreso urinario de la demandante durante las 24 horas siguientes a la operación era adecuado y no podía dar base a sospechar obstrucción ureteral alguna.
>
> 2. Declaró que no aparecía del récord que el doctor Hernández hubiera llevado a cabo un examen físico completo y a diario de la paciente. Al mostrársele las claras anotaciones del doctor Hernández que aparecían de sus notas de progreso diarias, el doctor Tortora tampoco pudo encontrar una explicación satisfactoria para su primera aseveración.
>
> 3. Declaró que del récord aparecían innumerables quejas de dolor en el costado derecho referidas por la demandante tanto al doctor Hernández como al personal de enfermería que la atendía y que el doctor Hernández había hecho caso omiso de las mismas. Al mostrársele el récord, nuevamente el doctor Tortora tuvo que admitir que no aparecía del récord de la demandante ni una sola queja de dolor en el costado derecho hasta el día 27 de julio de 1979, en horas de la mañana, cuando

el doctor Catasús le examinó el ángulo costo-vertebral derecho y, de inmediato, sospechó la posibilidad de una obstrucción ureteral y puso la correspondiente consulta al urólogo, doctor Acosta Otero para descartar la misma.

4. Declaró que el doctor Hernández hizo caso omiso a la fiebre en "picos y valles" que presentó la paciente después de la operación. Al confrontársele nuevamente con el récor[d] de la paciente, admitió que los picos y valles no comenzaron sino hasta el segundo día post-operatorio y que, en esta ocasión, el doctor Hernández, lejos de desatender esta queja, recetó el antibiótico Nebcin, sospechando que la fiebre pudiera ser como consecuencia de una infección de las vías respiratorias, lo cual es muy común en el período post-operatorio inmediato. Alegato de los recurridos, pág. 12.

En el caso de autos, la preponderancia de la prueba no estableció que la obstrucción del uréter derecho de la demandante recurrente y la posterior pérdida de su riñón se debieran a la actuación negligente del demandado recurrido, doctor Hernández, o a la forma en que llevó los récord médicos.

## V

*Sobre consentimiento informado*

Nos resta por considerar el planteamiento de los demandantes recurrentes sobre la ausencia de consentimiento informado.

■ El consentimiento de una paciente es un elemento indispensable para efectuar un procedimiento médico-quirúrgico, salvo los casos de excepciones reconocidas como las situaciones de emergencia y de perjuicio al estado sicológico de aprehensión del paciente. *Rojas v. Maldonado*, 68 D.P.R. 818 (1948); *Montes v. Fondo del Seguro del Estado*, 87 D.P.R. 199 (1963); *Torres Pérez v. Hosp. Dr. Susoni, Inc.*, 95 D.P.R. 867 (1968). Además, es necesario que ese consentimiento sea informado. El problema está en determinar

cuánta información hay que darle al paciente para que el consentimiento que éste preste no esté viciado.

■ La doctrina del consentimiento informado impone al médico el deber de informar a su paciente acerca de la naturaleza y riesgos de un tratamiento médico propuesto, de manera que el paciente se encuentre en la posición de hacer una decisión inteligente e informada. D.W. Louisell y H. Williams, 2 *Medical Malpractice* Cap. XXII, Sec. 22.3, pág. 22-13 (1986); I *Hospital Law Manual: Consent to Medical and Surgical Procedures* Secs. 2-2 a 2-3, págs. 24–27 (1986); F.A. Rozovsky, *Consent to Treatment: A Practical Guide*, Boston, Ed. Little, Brown and Co., 1984, pág. 9; R.R. Faden y T.L. Beauchamp, *A History and Theory of Informed Consent*, Nueva York, Ed. Oxford University Press, 1986.

La doctrina moderna establece que el médico le debe revelar a su paciente toda aquella información que, de acuerdo con su conocimiento y experiencia, necesitaría conocer el paciente por ser pertinente a la decisión que debe tomar en cuanto a consentir o no a someterse al procedimiento médico propuesto. *Canterbury v. Spence*, 464 F.2d 772 (D.C. Cir. 1972); H.M. Brau Del Toro y R.A. Marcial Rojas, *La doctrina del consentimiento ilustrado para tratamiento médico*, 54 Rev. Jur. U.P.R. 113 (1985).

■ El médico tiene la obligación de divulgarle al paciente los riesgos *razonablemente previsibles*, así como los beneficios de tratamientos y procedimientos invasivos del cuerpo humano y de las alternativas disponibles. También debe informar al paciente sobre los riesgos *probables* relacionados a no tratarse la condición.

■ Sin embargo, el médico no es responsable por no divulgar riesgos que razonablemente *no pueda preveer* o *por no informar de alguna secuela inesperada que surja durante la cirugía. Stottlemire v. Cawood*, 213 F. Supp. 897

(D.C. 1963); *Yeates v. Harms*, 393 P.2d 982 (1964); *Small v. Gifford Memorial Hospital*, 349 A.2d 703 (1975); Rozovsky, *op. cit.*, pág. 45; Brau Del Toro y Marcial Rojas, *op. cit.*, págs. 129–130. En general, el médico debe divulgar aquella información que él *razonablemente* crea o deba saber que genere un riesgo. Ello no significa que deba comunicar aquellos riesgos de los cuales un paciente promedio estaría advertido o sobre aquellos que el paciente particular haya descubierto por haber sido sometido a un tratamiento similar en el pasado. *Revord v. Rusell*, 401 N.E.2d 763 (1980); *Vergie M. Lapelosa, Inc. v. Cruze*, 407 A.2d 786 (1980); Louisell y Williams, *supra*, pág. 22-13.

Como sostuviéramos en *Ríos Ruiz v. Mark*, supra, los médicos tienen el deber de suministrar al paciente suficiente información sobre la naturaleza del tratamiento, los riesgos involucrados y los beneficios que se esperan. Aunque hay diversidad de criterios sobre el alcance y el contenido del deber de divulgación, hay consenso sobre el hecho de que no hay que divulgar *riesgos remotos* que hayan ocurrido en pocas ocasiones y que *no es probable* que le ocurran a ese paciente en particular.

Entendemos que la pérdida del riñón de la demandante recurrente no constituía un riesgo *razonablemente previsible* de la intervención a que ella iba a ser sometida y que hiciese mandatorio el que el médico le informara sobre ello. Por eso tampoco podría imponérsele responsabilidad al demandado recurrido por no haber informado unos riesgos que no eran probables. *Meeks v. Marx*, 550 P.2d 1158 (1976).

Cuando un demandante alegue que el médico que le trató incurrió en impericia profesional —por no haberle informado acerca de los peligros incidentales del tratamiento que le administró— tiene que establecer, de conformidad con los principios generales de negligencia, que la falta de infor-

mación adecuada fue la causa próxima del daño resultante. *Sard v. Hardy*, 379 A.2d 1014 (1977); *Poulin v. Zartman*, 542 P.2d 251 (1975); *Cobbs v. Grant*, 502 P.2d 1 (1972); *Natanson v. Kline*, 350 P.2d 1093 (1960); Rozovsky, *op. cit.*, Sec. 1.13, pág. 60; Louisell y Williams, *supra*, pág. 22-11. Así también, tendría el demandante que traer prueba sobre las normas de consentimiento informado aplicables al caso y la razón por la cual el médico incumplió con ellas. Rozovsky, *op. cit.*

En el caso ante nos, la demandante recurrente no presentó la prueba requerida para poderle imponer responsabilidad al médico demandado recurrido. Tampoco probó que la lesión al uréter y la pérdida posterior de su riñón derecho fueran riesgos razonablemente previsibles y probables de los cuales tuviera que haber sido advertida por el médico que la atendió.

Por otra parte, el tribunal de instancia concluyó que el médico demandado recurrido discutió con la demandante recurrente los riesgos previsibles implicados en la intervención quirúrgica a que ella iba a ser sometida y le indicó, además, la conveniencia de someterse al tratamiento por él propuesto. No surge de los autos que la paciente objetara o cuestionara de alguna manera el tratamiento que le propusiera el doctor Hernández o que le solicitara alguna información adicional a la prestada por él. Tampoco expresó deseo en consultar con algún otro médico sobre la posibilidad de que se le prestara un tratamiento alterno al propuesto por el doctor Hernández.

*Además, surge de los autos que la demandante recurrente, señora Rodríguez Crespo, el 23 de julio de 1979 brindó su consentimiento por escrito, con su firma y ante testigo, para la primera operación y admitió que se le había explicado la naturaleza y objeto de la operación, los métodos alternos de tratamiento, los riesgos involucrados y la posibilidad de complicaciones.* En su parte pertinente, dicho documento lee como sigue:

Por la presente solicito y autorizo a cualesquiera de los médicos de la Facultad Médica del Hospital Auxilio Mutuo de la Sociedad Española de Auxilio Mutuo y Médica del Hospital Auxilio Mutuo de la Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico, y especialmente al Dr. *OB-GYN PERINATAL MED* o a cualquiera de sus ayudantes o a cualquiera otro médico que él designe, o de quien él solicite cooperación o ayuda, para que practiquen en *MI PERSONA* la siguiente operación:

EXPLORATORY LAPARATOMY –RIGHT
SALPINGOOPHORECTOMY

y para que, si en el curso de la operación ocurriese *cualquier condición o situación imprevista* que a juicio de ellos requiera procedimientos *adicionales* o *convenientes*, o *procedimientos distintos* a los ahora contemplados, por la presente *solicito y autorizo* a todos y cada uno de ellos para que realicen todo lo que en su absoluta discreción estimen conveniente.

2. *La naturaleza y objeto de la operación, los métodos alternativos de tratamiento, los riesgos envueltos y la posibilidad de complicaciones, me han sido ampliamente explicados. Reconozco que no se me ha ofrecido garantía o seguridad en cuanto a los resultados que puedan obtenerse de dicha operación.*

CERTIFICO: *Que he leído, y entiendo perfectamente*[,] el [c]onsentimiento para [p]racticar una [o]peración arriba mencionad[a,] *que se me hicieron todas las explicaciones y advertencias a que se hace referencia en el mismo y que toda información requerida,* ha sido suministrada en los correspondientes espacios en blanco tachando los párrafos que no son de aplicación, antes de firmar. (Énfasis suplido.)

*Un consentimiento idéntico* fue prestado por la señora Rodríguez *ante distintos testigos* cuando se le realizaron *las intervenciones quirúrgicas posteriores*, incluso la última operación efectuada el 31 de octubre en la cual se le extirpó su riñón derecho.

No vemos cómo se puede sostener que la recurrente no prestó un consentimiento informado, cuando ella cuenta con preparación académica, es la contable *de la oficina de abo-*

*gados* que la representaron legalmente y admitió por escrito que se le había informado adecuadamente de todos los procedimientos que se llevarían a cabo sobre su persona, los métodos alternos y los riesgos involucrados. Ello convierte en académico este aspecto de la controversia.

Además, el testimonio que prestó la recurrente en corte sobre el consentimiento dado fue débil, que se caracterizó por su pobre recuerdo de los aspectos referentes al mismo. Dicho testimonio no puede superar la evidencia testifical y documental que tenemos ante nos, entre la cual se incluyen sus notas personales que reflejan un conocimiento detallado de todos los términos, diagnósticos, tratamientos, pruebas e intervenciones quirúrgicas que se realizaron. en su persona.

Por los fundamentos expuestos, *se dictará sentencia que confirma la del foro de instancia.*

El Juez Asociado Señor Rebollo López emitió voto particular de conformidad con la opinión. El Juez Asociado Señor Negrón García emitió opinión disidente, a la cual se une el Juez Asociado Señor Ortiz. La Juez Asociada Señora Naveira de Rodón se inhibió.

—O—

Opinión disidente del Juez Asociado Señor Negrón García, a la cual se une el Juez Asociado Señor Ortiz.

No podemos suscribir la opinión del Tribunal. En 1973 la "Carta de Derechos de los Pacientes" aprobada por la Asociación Médica de Puerto Rico, reconoció así el derecho al consentimiento ilustrado:

7. "El paciente tiene el derecho a recibir de su médico toda la información necesaria antes de dar su consentimiento para cualquier procedimiento o tratamiento. Excepto en emergencias, dicha información debe incluir *los riesgos médicos significativos envueltos* y la probable duración de la incapacidad, y

no debe estar limitada necesariamente a un procedimiento o tratamiento médico específico. Donde existan alternativas médicas significativas para el cuidado o tratamiento o cuando el paciente las solicite, éste tiene el derecho a tal información. El paciente también tiene el derecho a conocer el nombre de la persona responsable de los procedimientos y/o tratamientos".[1]

Esta declaración de principios está en consonancia con los pronunciamientos rectores de los tribunales sobre el desarrollo y contenido esencial de la *doctrina de consentimiento informado*. Nos sirve de punto de partida común para adentrarnos en dos (2) dimensiones atinentes al recurso. El primero, la aceptación casi unánime en la práctica de la medicina —respaldada en la profusa literatura— del alto riesgo e incidencia que hay en la cirugía ginecológica de lesionar y comprometer el uréter y, por ende, dañar un riñón. M.C. Daley, *Ureteral Injuries*, 1972 Med. Trial Tech. Q. 251 (1972). Esta realidad implica la necesidad de un cuidado especial que tiene que desplegar en un "procedimiento de histerectomía el cirujano [para] proteger la vejiga[;] en el curso de una histerectomía supravaginal del útero miomato, se debe tener cuidado de no incluir el uréter en la ligadura. Esta misma precaución debe tomarse cuando el cirujano está ligando los vasos uterinos. *Para estar legalmente seguros, se debe advertir al paciente, antes de la operación, sobre los posibles riesgos de lesiones geritourinarias implicados en una histerectomía*". (Traducción nuestra y énfasis suplido.) B.J. Ficarra, *Surgical and Allied Malpractice*, E.U.A., Ed. Charles C. Thomas, 1968, pág. 407.

Y el segundo, que el consentimiento ilustrado no es asunto a tomarse liviana y rutinariamente. Su importancia estriba en que "está basada en una larga tradición de promo-

---

[1] V. Font-Zelinsky, *El Consentimiento Informado Médico*, X (Núm. 2) Rev. Jur. U.I.A. 293, 295 (1976).

ver la propia autonomía y un proceso decisorio racional. La cantidad de información que debe exponer el médico al paciente es aquella que le permita a éste decidir por sí si va o no a someterse al tratamiento recomendado. Incluye información sobre riesgos de muerte o graves lesiones corporales, probabilidades de éxito, problemas en la recuperación y modos alternos de tratamiento. El proveer esta información contribuye a la relación médico-paciente y, por lo tanto, disminuye que se recurra a demandas por mala práctica si el tratamiento o resultado no es satisfactorio". (Traducción nuestra.) G.J. Annas, *Avoiding Malpractice Suits through the Use of Informed Consent*, 1977 Legal Med. Ann. 217, 231 (1977); A. Meisel, *The "Exceptions" to the Informed Consent Doctrine: Striking a Balance Between Competing Values in Medical Decisionmaking*, 1979 Wis. L. Rev. 413–488 (1979); Anotación, *Modern Status of Views as to General Measure of Physician's Duty to Inform Patient of Risks of Proposed Treatment*, 88 A.L.R.3d 1008 (1978).

I

El 9 de julio de 1979, la Sra. María Teresa Rodríguez, de cuarenta (40) años de edad, visitó al ginecólogo Dr. César Hernández por padecer de un dolor fuerte en el lado derecho del bajo vientre. Éste le practicó un examen profundo y doloroso, y le indicó que tenía un problema en el ovario derecho. Le ordenó un sonograma y pielograma intravenoso (I.V.P.) e informó que su impresión inicial diagnóstica era una condición de "Síndrome Residual del Ovario". Días más tarde, la señora Rodríguez regresó con los resultados de los estudios. El doctor Hernández, previo examen, confirmó su impresión diagnóstica. Le recomendó la remoción quirúrgica del tubo y ovario derechos (Salpingo-oforectomía), pues del sonograma surgía una masa sólida de aproximadamente 4 cm., en su dimensión más larga, localizada en el área del ovario. El informe del pielograma intravenoso (I.V.P.) de 12 de julio

reflejaba que sus riñones, de tamaño normal, funcionaban normalmente y no estaban obstruidos.

La señora Rodríguez Crespo ingresó en el Hospital Auxilio Mutuo el 23 de julio. Al otro día fue sometida a dicha cirugía. Durante el proceso, el doctor Hernández se confrontó con "múltiples adherencias, inflamación y fibrosis en el área del tubo y ovario derecho" resultantes de una apendectomía e histerectomía parcial previas, y de la propia condición del ovario que estaba quístico, inflamado y adherido a la pared del peritoneo. El muñón del ligamento infundibulopélvico estaba congestionado. Al identificar las estructuras anatómicas, removió el tubo uterino y ovario derechos. El curso post operatorio fue relativamente normal. Sin embargo, desde la tarde del 25 de julio de 1979 comenzó a tener fiebre de 38.5° que, salvo dos (2) ocasiones, no disminuyó de 38°. El 27 de julio a las 11:00 A.M., en una visita del Dr. Ubaldo Catasús, se quejó de dolor en su costado derecho. Éste, inmediatamente, sospechó un problema urológico. Seguidamente, solicitó una consulta al urólogo Dr. Andrés Acosta Otero. Ese mismo día, a la 1:00 P.M., el doctor Acosta Otero, previo examen, ordenó un I.V.P. que reveló que el riñón derecho estaba obstruido. Al atardecer la sometió a una citoscopía con retrógrado, lo cual corroboró la obstrucción en el uréter derecho, esto es, el tubo que conduce del riñón a la vejiga. Al día siguiente dicho galeno, estando presente el doctor Catasús, mediante una segunda operación, le liberó el mismo removiendo del área tejido inflamado y "varias suturas del tipo cuerda crómica (*O cromic gut*)".

El uréter recobró patencia temporal, pero lamentablemente, al tiempo, desarrolló estrechez y volvió a obstruirse. En los meses sucesivos, el doctor Acosta Otero la intervino quirúrgicamente en dos (2) ocasiones más sin éxito. Eventualmente, el riñón derecho se deterioró al punto de que fue necesario *extirparlo* el 31 de octubre.

La señora Rodríguez Crespo, por sí y en representación de su hijo menor Francisco Adolfo Boada, presentó en el Tribunal Superior, Sala de San Juan, demanda de daños y perjuicios contra el doctor Hernández, la Sociedad Profesional Figueroa, Longo, Comas, Catasús & Hernández, la Administración del Fondo de Compensación al Paciente y su aseguradora desconocida. Alegó que la pérdida del riñón se debió a una obstrucción en el uréter derecho "causada por la negligencia (*malpractice*) del Dr. Hernández al tomarle puntos de sutura que produjeron una angulación del uréter" (sentencia, pág. 29) durante la primera cirugía de 24 de julio. Sostuvo, además, que los demandados incurrieron en negligencia adicional al no diagnosticar a tiempo la obstrucción de dicho uréter. En su contestación a la demanda, éstos negaron toda negligencia y responsabilidad.

Durante los trámites procesales de rigor, la parte demandante recurrente cursó un interrogatorio a los médicos demandados recurridos en que formuló la pregunta siguiente: "Diga cu[á]l fue la causa de la obstrucción que impedía el funcionamiento normal del riñón derecho de María Teresa Rodríguez Crespo." Éstos contestaron: "La causa de la obstrucción que impedía el funcionamiento normal del riñón derecho de [la demandante recurrente] fue un *punto de sutura que parcialmente lo obstruyó*." (Énfasis suplido.) Alegato de la recurrente, págs. 2–3.

La demandante recurrente Rodríguez Crespo ofreció la anterior contestación como admisión de parte y solicitó del tribunal que enmendara el acta de vista con antelación a juicio. En cuanto a tal solicitud, el tribunal nada dispuso. Durante el juicio, reiteró ese pedido y se admitió en evidencia dicha contestación. En adición, ofreció su propio testimonio, el de su hermana Paula Kaufman y el del perito Dr. John Tortora para, en esencia, intentar establecer la negligencia del doctor Hernández consistente en obstruir el uréter al poner una sutura y no detectar a tiempo tal obstrucción.

La parte demandada recurrida, mediante el testimonio del doctor Hernández, del doctor Acosta Otero —quien interviniera en la segunda operación— y del perito Dr. Fernando J. Montilla López, esbozó la teoría de que la causa de la obstrucción no fue una sutura, sino varias unidas al proceso natural de un tejido inflamatorio, edematoso y fibrótico que se formó en la región del ligamento infundibulopélvico y que, gradualmente, comprimió el uréter.

El tribunal declaró sin lugar la demanda por sentencia de 14 de agosto de 1984. En la misma, concedió entero crédito a las declaraciones del codemandado recurrido Hernández y sus peritos. Adoptó su teoría de lo sucedido.

A solicitud de la señora Rodríguez Crespo, revisamos. Ante nos señala seis (6) errores susceptibles de ser condensados en dos (2): (1) errónea apreciación de la prueba sobre negligencia y relación causal, y (2) que no medió consentimiento informado, pues no se le advirtió sobre el riesgo de daño al uréter y la posibilidad real de perder el riñón. Bajo este esquema dual los analizaremos.

## II

Primeramente, en cuanto a la negligencia y relación causal, en síntesis, nos plantea que el tribunal de instancia incidió al determinar que la causa fue *natural* —lo comprimió el tejido inflamatorio— y que el doctor Hernández actuó con sumo cuidado, pues era consciente de evitar lesionar el uréter y, visualmente y por tacto, se cercioró que no lo había comprometido. A juicio suyo, la prueba demostró que dicho galeno fue negligente al obstruir el tubo uterino mediante un punto de sutura y no detectar la obstrucción a tiempo.

Sobre el particular, el foro de origen concluyó:

Ante este cuadro, el doctor Hernández procedió a identificar las estructuras anatómicas a ser removidas, así como también las estructuras anatómicas que se encuentran en el área inmediata a la cirugía, con especial énfasis en el ur[é]ter del

lado derecho. La identificación del ur[é]ter del lado derecho fue llevada a cabo por el doctor Hernández tanto por tacto como visualmente, haciendo su curso dicho ur[é]ter a corta distancia del peritoneo posterior, por debajo y por detrás del ovario derecho. *Con el ur[é]ter bajo visión directa, confirmado por la palpación,* el doctor Hernández *cuidadosamente* despegó el ovario y tubo que se encontraban adheridos a la pared posterior del peritoneo y removió los mismos luego de amarrar el ligamento infundibulopélvico con suturas dobles.

Durante todo el proceso de colocación de suturas para lograr hemosta[s]is en el [á]rea en cuestión, el doctor Hernández tuvo el ur[é]ter derecho de la demandante bajo visión directa y ejercitó sumo cuidado para no lastimarlo ni traumatizarlo.

También tuvo visión directa del referido ur[é]ter derecho al unir nuevamente la pared posterior del peritoneo de la que se había removido el tubo y ovario que se encontraban adheridos a la misma, mediante el uso de suturas. *Luego de completar este procedimiento el doctor Hernández visualizó nuevamente el ur[é]ter y palpó su curso en el trayecto comprendido entre la parte superior del área intervenida hasta que el ur[é]ter llega a la vejiga, cerciorándose así de que el ur[é]ter derecho de la demandante no había sufrido daño accidental alguno durante el procedimiento quirúrgico llevado a cabo por él.* Luego de esta confirmación visual y por tacto, el doctor Hernández se cercioró de que no había extravasación alguna de orina en el área intervenida y, en consecuencia de ello optó por no llevar a cabo ningún otro procedimiento para descartar que dicho ur[é]ter hubiera sufrido daño durante el acto quirúrgico. (Énfasis suplido y escolios omitidos.) Alegato de la recurrente, págs. 4–5.

Estas determinaciones básicamente están fundadas en el testimonio exclusivo del doctor Hernández. Ninguna otra persona allí presente declaró. En el informe de operación no menciona el uréter, sino la "limpieza (lisis) de las adherencias y hemostasis asegurada. Ligamento derecho Infundibulopélvico removido. Ovario derecho y tubo pegado al peritoneo posterior removido. Hemostasis asegurada. [*Lysis of adhesions performed hemostasis secure. Right Infundybulo-*

*pelvic Ligament removed. Right ovary and tube removed from the adherent posterior peritoneum. Hemostasis secure*]". (Traducción nuestra.)

Hemos revisado cuidadosamente la abundante prueba documental y la voluminosa transcripción. En la superficie, la cuestión aparenta ser debatible; en el fondo no lo es. Aparte de la contestación inculpatoria del doctor Hernández a la pregunta, la señora Rodríguez Crespo atestó que su socio, el doctor Catasús —miembro de la Sociedad Profesional codemandada recurrida— le admitió que, debido a las muchas adherencias, al coger los puntos el doctor Hernández le había cogido el uréter *doblado*.(2) Atestiguó, también, que el propio doctor Hernández le había dicho que "había mucha sangre, había muchas adherencias y al coger los puntos se cogió el uréter *doblado*". (Énfasis suplido.) T.E. I, pág. 135.

Su hermana Paula Rodríguez Crespo igualmente declaró que el doctor Catasús le había explicado que "[tenía] el uréter kinkado", condición que ilustró y comparó como "si se cogiera una manguera de agua y la doblara". T.E. I, págs. 196–197 y 223–224. El doctor Catasús fue anunciado como testigo y estuvo disponible durante la vista. Sin embargo, no testificó para refutar en forma alguna los testimonios de la señora Rodríguez Crespo y su hermana. Fue puesto a disposición de la parte demandante recurrente, quien tampoco lo utilizó. T.E. II, pág. 343. Tampoco el doctor Hernández contradijo o negó veracidad al testimonio de la demandante re-

---

(2) "P: . . . ¿Qué le dijo a usted el doctor Catasús que había ocurrido con ese uréter?

"R: Sí, pues el doctor Catasús me, cuando él llegó al cuarto yo le pregunté: 'Doctor, ¿qué fue lo que le pasó al doctor Hernández en la primera operación?'

.     .     .     .     .     .     .     .

"Pues, entonces el doctor Catasús me dice que yo tenía ahí un revolú, que tenía muchas adherencias y que había mucha sangre, que tenía el ovario pegado al intestino y el doctor Hernández al coger los puntos había cogido el uréter doblado."

currente Rodríguez Crespo sobre las expresiones que se le atribuyeron cuando la visitó el 30 de julio de 1979.

El urólogo, doctor Acosta Otero, en su intervención de 27 de julio encontró una obstrucción ureteral derecha a nivel del ligamento infundibulopélvico (T.E. II, pág. 443) y la liberó cuatro (4) días después de la salpingo-oforectomía realizada por el doctor Hernández. Aunque en la vista del caso atribuyó la obstrucción al proceso del tejido inflamatorio, desde el 17 de septiembre de 1981 —en una deposición anterior— había aceptado que el "uréter, aparentemente, estaba angulado cerca de donde se removió este tejido inflamatorio, porque obviamente al remover este tejido el uréter se puso permeable . . .". T.E. II, pág. 470. Reconoció que estaba exponiendo una teoría en dicha ocasión (T.E. II, pág. 473) y que no vio "ninguna ligadura y esto debe estar bien claro alrededor del uréter . . .". T.E. II, pág. 477. Ello es explicable, pues "usualmente es difícil, si no imposible, determinar o diferenciar el tipo de lesión cuando el trauma uretal se reconoce después de la operación". (Traducción nuestra.) L.A. Orkin, *Trauma to the Ureter: Pathogenesis and Management*, Philadelphia, Ed. F.A. Davis, 1964, pág. 143. Su informe de operación, en lo pertinente, expresó:

> Examinada la región del riñón infundibulopélvico derecho y el tejido inflamatorio a su alrededor disecado. *Algunas suturas de cuerda o crómico removidas del área.* Disección uretral derecho realizada. (Traducción nuestra y énfasis suplido.) Informe de operación, pág. 71.

El tejido extraído fue examinado por el patólogo Dr. Manuel De Jesús. Su tamaño era de 3 x 2 x 1 cm. en dos (2) fragmentos irregulares, colores *brown*-gris obscuro; tejido blando gomoso, con segmentos pegados de material de sutura. T.E. II, pág. 302. El tribunal sentenciador las describió del tamaño aproximado de una "pelota de golf". La analogía es errónea. Tal y como aduce la recurrente Rodríguez Crespo, su diámetro sería de 1.68 pulgadas, equivalentes a

4.267 cms. Si aplicamos la fórmula de $\frac{4}{3}$ IIr$^3$ para hallar el volumen de una esfera, su volumen sería aproximadamente 40.68 centímetros cúbicos (cc), lo cual contrasta sustancialmente con el verdadero volumen de 6 cc que tenía el tejido inflamatorio con suturas que el urólogo Acosta Otero removió.

De un análisis sereno y objetivo de la prueba documental y testifical surge que, antes de la cirugía practicada por el doctor Hernández, los riñones de la señora Rodríguez Crespo eran normales y funcionaban bien. Como resultado de la misma, el 24 de julio se le obstruyó el uréter con suturas. Aun cuando dicho galeno atestó que era muy consciente de ese riesgo, curiosamente no menciona el "uréter" en ningún momento en su informe de operación. No empece su testimonio de que siempre lo visualizó y lo palpó varias veces, lo cierto es que el 27 de julio se comprobó radiológicamente la obstrucción. El urólogo Acosta Otero lo liberó el 28 de julio removiendo tejido blando y gomoso a su alrededor que contenía suturas.

Distinto al foro de instancia, nos inclinamos a sostener que estas suturas causaron la obstrucción total que se produjo en el uréter. Arroja luz la prueba desfilada de que el doctor Hernández había cogido el uréter "kinkado", circunstancia que el doctor Catasús ilustró con el dedo angulado como una manguera que se dobla para no dejar pasar líquido.

Por otro lado, es cuestionable la explicación de que el tejido inflamatorio causara la obstrucción. Ello no concuerda con la comparación volumétrica del tejido que removió el doctor Hernández (40.70 cc) y el posteriormente removido por el doctor Acosta Otero (6 cc). Causa inquietud de que, siendo el uréter elástico, flexible y, por ende, desplazable dentro de una cavidad, no se desplazó. Nos es difícil sostener que en tan poco tiempo, en ausencia de una infección, dicho tejido alcanzara tan grandes proporciones. Lo más lógico es concluir que las suturas lo aprisionaron causando su angula-

ción. Veinticuatro (24) horas después de la cirugía realizada por el doctor Hernández, la paciente comenzó a manifestar fiebre que osciló (excepto en dos (2) ocasiones) entre 37.5° y 38.5°. Aun así, el tribunal sentenciador enfatizó que la señora Rodríguez Crespo eliminó 2,000 cc de orina desde que se inició la operación a las 12:00 del mediodía de 24 de julio hasta las 7:00 A.M. de 25, y que ello descartaba la sospecha de una obstrucción en el uréter derecho. El análisis, aunque correcto, es limitado. Era menester estar atento a otros riesgos e indicadores. "Cuando un uréter es accidentalmente ligado o comprimido durante una operación pélvica, *la paciente puede no tener síntomas*. Usualmente ella se queja de dolor en la región del riñón o del costado, o si ambos uréteres han sido ligados, puede tener anuria. Desligarlos inmediatamente es lo indicado. Cuando un uréter está completamente ligado, usualmente cesará la función en el riñón respectivo. *Debido a que el otro riñón está funcionando, ningún síntoma intempestivo se evidenciará inmediatamente. Si alguna función continúa en el riñón con el uréter ligado, sobrevendrán síntomas de obstrucción.* Si se realiza temprano, una urografía excretoria revelará el problema." (Traducción nuestra y énfasis suplido.) C. Winter y A. Morel, *Nursing Care of Patients with Urologic Diseases*, St. Louis, The C.V. Cosby Co., 1977, pág. 337. Igualmente, el "dolor en el costado muchas veces está obscuro durante varios días por el malestar causado por la incisión abdominal". L.J. Gordy y R.N. Gray, 4B *Attorneys' Textbook of Medicine* Cap. 284, Sec. 284.35(3), pág. 284-18 (1986).

En resumen, la explicación del doctor Hernández a su contestación inculpatoria al interrogatorio no satisface la conciencia informada del juzgador.(3) A juicio nuestro, la

---

(3) "P. Doctor, si su teoría es de que la inflamación de esa área donde usted cogió esos puntos fue lo que causó la obstrucción de este uréter, ¿Por qué usted en

prueba integralmente apreciada demostró satisfactoriamente que, aunque inintencionalmente, con una (o varias) suturas anguló el uréter y causó una obstrucción.

Su negligencia consistió en no adoptar todas las medidas que las circunstancias singulares exigían. Aun cuando, según su propio testimonio, el campo visual operatorio de la paciente era difícil, pues tenía bastantes adherencias y mucha sangre (T.E. I, pág. 135), antes de culminar la cirugía no realizó ninguna prueba para corroborar que el uréter estaba bien.

El perito doctor Tortora testificó que la experiencia reconoce que las suturas en el área cercana al uréter aumentan la posibilidad de daño. La buena práctica exige que el cirujano esté muy atento para evitarlo y constatar de que no lo ha comprometido. T.E. I, págs. 258–259. Describió los tres (3) procedimientos que existen —además de la visualización y

---

una pregunta de un interrogatorio que se le hizo, usted contestó que la causa de la obstrucción del uréter fue un punto de su . . . un punto de sutura que obstruyó el uréter parcialmente?

"R. No uno, unos, ¿verdad? porque en realidad si dice uno, me equivoqué en la cantidad, son más.

"HON. JUEZ:

"Son más, dice, más de uno. Fue que se equivocó.

"SR. TESTIGO:

"R. Bueno, lo que pasa es que esos son los puntitos que estamos hablando que están aquí como factor irritativo. O sea, acuérdate que esos puntos se quedan ahí día tras día.

"LIC. ALVARADO:

"P. Y cuando usted contestó esa pregunta número dieciséis en esa forma, ¿usted se refería a eso que usted explicó ahí?

"R. Sí, porque eso es lo que . . . fíjate, este . . . es parcialmente, esto es lo que va creando la distensión como otro factor, porque fíjate que todos los demás son líquidos del organismo. El edema es del propio paciente, la sangre es del propio paciente, la inflamación es del propio paciente. Aquí lo único que no es del paciente son los puntos, por lo tanto, es un cuerpo extraño sobre un área inflamada, lo cual la irrita más. Y es lo único que no desaparece porque todo lo demás el organismo lo puede manejar. Lo único que no puede manejar es la absorción rápida de esas suturas porque viene para quedarse ahí un paquetón de tiempo." T.E. II, págs. 333–334.

palpación— para detectar y comprobar en este tipo de cirugía difícil la patenticidad del uréter antes de cerrar el abdomen, a saber: (1) inyección del tinte *Indigo Carmine*; (2) realización de citoscopía (T.E. I, págs. 263–266; T.E. II, pág. 11), y (3) un I.V.P. intraoperatorio (T.E. II, págs. 91–94). Véase Daley, *supra*, págs. 251–253.

En las circunstancias de autos la prudencia debió imponerse. Aconsejaba una de esas pruebas. Era lo apropiado. La omisión constituyó negligencia. No hacerlo significó exponer a la paciente a un riesgo grave. Las lesiones al uréter durante una operación constituyen una seria complicación quirúrgica. "El pecado venial es la lesión al uréter, pero el pecado mortal es fallar en reconocerlo." (Traducción nuestra.) C.C. Higgins, citado en Gordy y Gray, *supra*, pág. 284-16. La prevención es posible si se es consciente del uréter antes, durante y después de una operación. M.F. Campbell y J.H. Harrison, *Urology*, Philadelphia, Ed. W.B. Saunders, 1970, Vol. I, págs. 828–834; P.D. Cantor, 5 *Traumatic Medicine and Surgery for the Attorney* Cap. 1216, págs. 628–633 (1961); R. Baker, *Genitourinary Trauma*, 4(2) Law. Med. J. 162–165 (1968); Anotación, *Malpractice: Surgeon's Liability for Inadvertently Injuring Organ other than that Intended to be Operated On*, 37 A.L.R.3d 464, 542–553 (1971).

El peligro de grapar, angular u ocluir un uréter se hace más próximo en el área del ligamento infundibulopélvico. Orkin, *op. cit.*, págs. 18–19 y 153–156. "Las cirugías que envuelven el ligamento infundibulopélvico [como la de autos] ponen al uréter en un gran riesgo. Debido al hecho de que en esa localidad el uréter está extremadamente superficial, surgen las siguientes posibilidades: primero, cuando se esté ligando los vasos de ovario, el uréter sea incluido, y segundo, cuando se esté dividiendo el ligamento infundibulopélvico, el uréter sea seccionado. *Estas posibilidades aumentan marcadamente ante condiciones patológicas tales* como tumor, endometriosis, *inflamación adnexal y adherencias densas debi-*

*do a pasadas cirugías, todas las cuales pueden distorcionar la anatomía del ligamento.* Por lo tanto, cuando esté operando en la vecindad del ligamento infundibulopélvico, es esencial primero exponer la posición próxima del uréter pélvico antes de ligar los vasos de ovarios o cercenar el propio ligamento." (Traducción nuestra y énfasis suplido.) Orkin, *op. cit.*, pág. 156. Este autor clasifica así las lesiones por la frecuencia en que ocurren: "ligadura, aplastarlo, doblarlo *(kinking)* por ligadura; inversión parcial o completa; perforación por aguja; excisión uréter incluido en tumor; interferencia con el movimiento de sangre que lleva a necrosis y *desplazamiento del uréter por angulación -sutura cerca de uréter.*" (Traducción nuestra y énfasis suplido.) Íd., pág. 143.

A la luz de lo antes expuesto, ¿puede razonablemente sostenerse que el doctor Hernández no debió haber sospechado que había afectado el uréter?

## III

Ahora bien, si argüimos que no se hubiese demostrado negligencia por parte del doctor Hernández, examinemos el señalamiento de que incidió el tribunal de instancia al concluir que aquél le informó adecuadamente a la señora Rodríguez Crespo la naturaleza y riesgos más comunes de la enfermedad, y de esa forma obtuvo su consentimiento informado para practicar la operación. La cuestión requiere que repasemos y actualicemos nuestros pronunciamientos sobre el consentimiento.

En el pasado nuestras decisiones en torno al requisito del consentimiento en el tratamiento médico han sido escasas. Desde que nos acercamos por primera vez a la figura en *Rojas v. Maldonado*, 68 D.P.R. 818 (1948), hemos tenido la oportunidad de expresarnos en *Montes v. Fondo del Seguro del Estado*, 87 D.P.R. 199 (1963), y *Torres Pérez v. Hosp. Dr. Susoni, Inc.*, 95 D.P.R. 867 (1968). Ambos casos reconocieron que el consentimiento del paciente era elemento indis-

pensable para efectuar un procedimiento médico-quirúrgico. El valor tutelar protegido es el señorío del sujeto sobre su cuerpo, o lo que en efecto es igual, el "derecho del paciente a la autodeterminación". G. Robertson, *Informed Consent to Medical Treatment*, 97 L.Q. Rev. 102 (1981). Así, en *Montes v. Fondo del Seguro del Estado*, supra, pág. 203, al citar a *Rojas v. Maldonado*, supra, expresamos "'que el consentimiento del paciente es necesario para autorizar al cirujano a practicar una operación en el cuerpo de aquél y que una operación practicada sin tal consentimiento es un acto torticero e ilegal que hace responsable al cirujano por los daños causados al paciente'". Concluimos allí que "[a]l actuar sin la autorización . . . el demandado incurrió en culpa extracontractual o aquiliana, se hizo responsable de las consecuencias de sus actos y quedó legalmente obligado a reparar el daño causado". *Rojas v. Maldonado*, supra, pág. 826.

Al principio expuesto le fueron forjadas las excepciones de emergencia y evidente perjuicio al estado psicológico de aprehensión del paciente en *Torres Pérez v. Hosp. Dr. Susoni, Inc.*, supra, págs. 873–874. Véase, además, J.M. Fernández Hierro, *Responsabilidad Civil Médico-Sanitaria*, Pamplona, Ed. Aranzadi, 1984, pág. 64.

Sin embargo, advertimos que *Montes v. Fondo del Seguro del Estado*, supra; *Rojas v. Maldonado*, supra, y *Torres Pérez v. Hosp. Dr. Susoni, Inc.*, supra, examinaron la controversia de la responsabilidad del médico cuando sometía a un paciente a un tratamiento médico sin su consentimiento. El caso que nos ocupa plantea otra dimensión: el vicio del consentimiento del paciente *por falta de información adecuada*. Exploremos sus perfiles.

## IV

Expone Ataz López que "[p]arece claro, por tanto, que la afirmación de la obligación del médico de no actuar sobre el cuerpo de su paciente más que cuando éste haya consentido

libremente, debe ir acompañada necesariamente del reconocimiento de un *deber por parte del médico de informar acerca de estos extremos.* El médico debe informar al paciente para que éste cuente con los suficientes elementos de juicio como para decidir libremente si desea o no la realización del tratamiento propuesto. *Por ello esta información debe versar en primer lugar sobre el diagnóstico, y en segundo lugar sobre el tratamiento propuesto".* (Énfasis suplido y escolio omitido.) J. Ataz López, *Los médicos y la responsabilidad civil,* Madrid, Ed. Montecorvo, 1985, pág. 69.

Al efecto, elabora Fernández Hierro:

El deber de información consiste en la obligación del médico de hacer saber al paciente cuál es su estado, el diagnóstico de su enfermedad, el tratamiento a seguir, así como los riesgos inherentes y las consecuencias de dicho tratamiento.

No hay que olvidar que el enfermo generalmente no tiene conocimientos médicos suficientes, por lo que el médico para cumplir este deber debe, en palabras de la corte de casación francesa, dar "una información simple, aproximada, inteligible y leal para permitir al enfermo tomar la decisión que estime debe adoptarse".

En definitiva se trata de trasladar a idioma vulgar y a términos comprensibles los datos médicos que permitan al enfermo saber su estado actual, el tratamiento a seguir y los riesgos y consecuencias del futuro tratamiento o intervenciones: resaltando que, para que se entienda cumplido el deber de información, deberá darse sobre los tres aspectos antes mencionados, ya que no basta informar del estado actual si no se dice cuál es el posible tratamiento, y tampoco se puede considerar suficiente la indicación del tratamiento si no se advierte de los peligros que éste puede llevar consigo. (Escolios omitidos.) Fernández Hierro, *op. cit.,* págs. 64–65.

Tal deber de explicar o aclarar al paciente las consecuencias del tratamiento se extiende a las normales y no a las de "causación rara". J. Santos Briz, *La Responsabilidad Civil,* Madrid, Ed. Montecorvo, 1981, pág. 721. Aunque la jurispru-

dencia española no se ha pronunciado sobre el deber de información del médico, Fernández Hierro, *op. cit.*, pág. 65, la francesa ha requerido que el cuidado que provea el médico sea administrado solamente después que el paciente ha sido informado de los riesgos potenciales del tratamiento recomendado. T.E. Carbonneau, *The Principles of Medical and Psychiatric Ability in French Law*, 29 Int'l and Comp. L.Q. 742, 743 (1980). De forma similar, la jurisprudencia alemana considera suficiente que el médico exponga al paciente aquellos peligros que suelen estar relacionados con la operación y con cuya contingencia debe contarse como probable según el estado de la experiencia y ciencias médicas. Fernández Hierro, *op. cit.*, pág. 65.

En Estados Unidos se ha discutido ampliamente la extensión de la información médica que el paciente debe recibir de su médico para hacer una decisión inteligente o para aceptar o rechazar un tratamiento médico. P.S. Appelbaum, Ch. W. Lidz y A. Meisel, *Informed Consent: Legal Theory and Clinical Practice*, Nueva York, Oxford University Press, 1987; P.D. Cantor y C.S. Silverman, *Analysis of the Doctrine of Informed Consent: Perspective on a Medicolegal Problem*, 1971 Legal Med. Ann. 433–445 (1971); R. Bucklin, *Informed Consent: Past, Present and Future*, 1975 Legal Med. Ann. 201–214 (1975).

El consentimiento no es el simple asentir al tratamiento propuesto. La aceptación debe estar fundada en el conocimiento de elementos materiales que lleve al paciente a dar un consentimiento ilustrado. Pues, si bien el consentimiento releva de responsabilidad, como expone la máxima *volenti non fit injuria*, de no proveerse información relevante, la aceptación sería viciada e ineficaz. La exigencia del consentimiento informado surge de visualizar la relación médico-paciente como fiduciaria en su naturaleza. El paciente promedio es lego en la ciencia médica, no poseyendo el mismo grado de destreza que su médico. Así, el paciente depende de

su médico en la obtención de información esencial para hacer decisiones médicas. El deber fiduciario del médico requiere de él que revele esa información al paciente. Nota, *Informed Dissent: A New Corollary to the Informed Consent Doctrine?*, 57 Chi.[-]Kent L. Rev. 1119 (1981).

"Sencillamente expuesta, la doctrina del consentimiento informado requiere que el doctor suministre a su paciente información suficiente sobre el tratamiento propuesto y así proveerle la oportunidad de hacer una decisión 'informada' o 'racional' de si debe someterse al mismo." (Traducción nuestra.) Robertson, *supra*. Esta doctrina "teóricamente transforma el proceso decisional médico de uno consensual, en el cual el médico meramente obtiene la aquiescencia del paciente, a una de participación, en el cual el paciente juega un rol activo —considerando información, sopesando las alternativas y balanceando los riesgos frente a los beneficios". (Traducción nuestra y escolio omitido.) Nota, *From Informed Consent to a Duty to Convince: Truman v. Thomas*, 18 Hous. L. Rev. 917 (1981).

El fundamento jurídico para imponer responsabilidad civil a un médico que opera sin el consentimiento del paciente es el concepto de culpa subsumido en el Art. 1802 de nuestro Código Civil, 31 L.P.R.A. sec. 5141. *Rojas v. Maldonado*, supra, pág. 826; H.M. Brau Del Toro y R.A. Marcial Rojas, *La doctrina del consentimiento ilustrado para tratamiento médico*, 54 Rev. Jur. U.P.R. 113, 154 (1985).

Por el contrario, en situaciones como la del caso de autos, donde existe una ausencia de consentimiento informado, el fundamento jurídico para imponer responsabilidad es la institución de la negligencia. Brau Del Toro y Marcial Rojas, *supra*. Esta última surge por la violación no intencional del derecho del paciente a recibir información sobre el procedimiento médico propuesto para su cuerpo. *Rojas v. Maldonado*, supra, pág. 825.

En demandas de mala práctica médica, la negligencia como causa de acción se proyecta en dos (2) vertientes, a saber, "[la] verdadera negligencia profesional, constituida por la ejecución negligente de algún procedimiento médico. . . . Existe también un segundo tipo [de negligencia], una negligencia de carácter administrativo, referente sólo a casos médicos, donde el daño se configura al no proveer suficiente información al paciente como para permitirle dar un consentimiento verdadero, relevante, apropiado e informado". (Traducción nuestra y énfasis suprimido.) Nota, *Medical Malpractice: The Scope of Informed Consent in Negligence*, 32 Int'l and Comp. L.Q. 229, 231 (1983). En tales instancias, la negligencia se configura debido a la omisión del médico de ilustrar adecuadamente al paciente sobre el tratamiento a brindarse. Tal ilustración requiere del médico hacer ciertas revelaciones mínimas antes de someter al paciente a un procedimiento que conlleva riesgo: "(1) la descripción del tratamiento propuesto; (2) alternativas al tratamiento propuesto; (3) riesgos inherentes de muerte o lesiones corporales serias en el tratamiento propuesto; (4) problemas de recuperación anticipables; y (5) cualquier información adicional que otros médicos en circunstancias similares revelarían." (Traducción nuestra y escolios omitidos.) M.G. Victor, *Informed Consent*, 1981 Med. Trial Tech. O. 138, 141–142 (1981).

Estas exigencias de informar encuentran sus excepciones si: "(1) es una emergencia; (2) [cuando] el paciente específicamente solicita no ser informado; (3) [cuando] el procedimiento es simple y el riesgo es remoto y es comúnmente apreciado como remoto; y (4) [cuando], a juicio del médico, el conocimiento no resultaría beneficioso para el paciente." (Traducción nuestra y escolios omitidos.) Victor, *supra*, pág. 142.

La autorización para realizar el tratamiento o procedimiento debe darse sobre el fundamento, no sólo de conocimiento de los riesgos que acarrea éste, sino también del conocimiento de alguna otra alternativa disponible. "El ejercicio significativo del poder de selección ciertamente envuelve la consideración de alternativas." (Traducción nuestra.) E. Rauzi, *Informed Consent in Washington: Expanded Scope of Material Facts that the Physician must Disclose to his Patient*, 55 Wash. L. Rev. 655, 666 (1980). Un médico no libera su responsabilidad con simplemente informarle al paciente los posibles riesgos involucrados en un diagnóstico o tratamiento. Su deber va más allá. Su compromiso ético implica señalar la existencia de procedimientos alternos si existieran.

Lo expuesto basta para decidir el caso de autos. No es necesario refinar los linderos de los conceptos antes expuestos más allá de su situación fáctica.(4) Apliquémoslos.

---

(4) *Canterbury v. Spence*, 464 F.2d 772 (D.C. Cir.), *cert.* denegado 409 U.S. 1064 (1972), constituye la expresión judicial de mayor impacto inicial sobre consentimiento ilustrado. Allí se adoptó un estándar objetivo apuntalado en la figura del "paciente promedio y razonable", y el interés y principio de autodeterminación a que nos hemos referido antes. H.M. Brau Del Toro y R.A. Marcial Rojas, *La doctrina del consentimiento ilustrado para tratamiento médico*, 54 Rev. Jur. U.P.R. 113, 132 (1985). "Resolvió *Canterbury* que si un paciente ha de tomar una decisión inteligente al consentir o no a un procedimiento médico o quirúrgico, *debe ser provisto de la información que sea material a su decisión desde el punto de vista del paciente, independientemente de lo que los médicos razonables y promedio de la comunidad suelan divulgar a sus pacientes.*" Íd. pág. 122. El contenido de esta divulgación es amplio. Incluye "información sobre: (1) el diagnóstico (obsérvese que si para llegar a este diagnóstico fue necesario someter al paciente a pruebas que conllevaron la necesidad de invadir su cuerpo, el médico debió obtener previamente el correspondiente consentimiento ilustrado para someter al paciente a tales pruebas.), (2) la naturaleza general del procedimiento que se recomienda, (3) sus probabilidades de éxito, (4) los riesgos que encierra dicho procedimiento, (5) el pronóstico del paciente si no se sometiese a dicho procedimiento, (6) la misma información en cuanto a otras alternativas de tratamiento, de haberlas." Íd., pág. 128. La obligación no es absoluta. Admite excepciones fundadas en el bienestar del paciente, urgencias médicas, extensiones inesperadas de intervenciones quirúrgicas, todas en virtud de una valoración de cada caso en particular.

## IV

En su sentencia, el tribunal de instancia se refirió a que los propios demandados recurridos doctor Hernández *et al.*, hicieron constar que "la literatura médica describ[ía] *muchos* casos de obstrucciones ureterales; como la ocurrida en este caso . . ." . Sentencia, pág. 2. Según la literatura antes expuesta, esta conclusión está apoyada en innumerables estudios. "A menudo la obstrucción es el problema primario debido a la incorporación del uréter en una ligadura quirúrgica." (Traducción nuestra.) 6 *Lawyers' Medical Cyclopedia* Sec. 44.28(D), pág. 529 (1977); Orkin, *op. cit.*, págs. 98, 143; *El Manual de Merck*, Ed. Merck, Sharp and Dohme, 1964, pág. 1029.

"Varios tipos de lesiones al uréter durante los procedimientos quirúrgicos incluye trauma instrumental (tales como dilatación uretal utoxópica, o el intento de remover instrumentalmente un cálculo en el uréter) o ligadura o presión accidental, así como durante la histerectomía. . . . Cuando el uréter es accidentalmente ligado o aplastado, *como puede ocurrir durante una cirugía pélvica ginecológica, la gravedad del accidente no debe sobreestimarse.* Aproximadamente el 10% de las mujeres sometidas a estas operaciones sufren este accidente. *La mayoría recobran sin trastornos clínicos, aunque el resultado final es la destrucción hidronefrénica del riñón.*" (Traducción nuestra.) 6 *Lawyers' Medical Cyclopedia*, supra, Sec. 44.43, pág. 601.

"La integridad del uréter, ese importante conducto urinario, es esencial al buen funcionamiento del cuerpo. Por lo tanto, lesiones al uréter, seguramente pueden producir consecuencias serias y fatales. La gran preponderancia de tales lesiones no son resultado de violencias externas, sino de las manipulaciones de los médicos. Se sabe de lesiones del uréter ocurridas durante procedimientos ginecológicos al igual que durante procedimientos de diagnósticos o quirúrgicos

generales que envuelven el abdomen y la vía genitourinaria." (Traducción nuestra.) Gordy y Gray, *supra*, Sec. 284.00, pág. 284-1. "La relación próxima del uréter a las estructuras pélvicas le hacen particularmente más vulnerable a daño durante la cirugía ginecológica, pues discurre cerca del pedículo vascular del ovario al borde de la pelvis y se acerca a la arteria uterina dentro del amplio ligamento[,] y está al lado de la unión del útero y la cerviz." (Traducción nuestra.) Íd., Sec. 284.01(2), págs. 284-2, 284-5.

En resumen, es evidente que una lesión al uréter, en particular en una operación ginecológica, "es un riesgo médico significativo" que, conforme la experiencia y estado actual de la medicina, es serio y puede ocurrir con alguna frecuencia. A su vez puede afectar e incluso dañar totalmente un riñón. Por ende, resolvemos que la señora Rodríguez Crespo era acreedora a que el doctor Hernández así se lo informara.

El tribunal de instancia determinó que "[e]l doctor Hernández le explicó a la Sra. Rodríguez Crespo que el tratamiento para [su] condición era quirúrgico y procedió a *informarle sobre la naturaleza y riesgos más comunes de la referida intervención*". Sentencia, pág. 4. Sostuvo que ella los entendió en vista de sus estudios universitarios, experiencia en una oficina de abogados e historial de dos (2) cirugías previas. Erró. Como veremos, la prueba no sostiene esa conclusión.

A tal efecto transcribimos la porción pertinente del contrainterrogatorio a que fue sometida la demandante recurrente Rodríguez Crespo.

P: El doctor Hernández, ¿examinó los resultados de sus pruebas?
R: Sí, señor.
P: ¿Usted discutió con él los resultados de sus pruebas?
R: [É]l me informó acerca del sonograma.
P: ¿Y qué le dijo el doctor Hernández en esa ocasión?
R: Que había una masa al lado del ovario derecho.

P: ¿Usted le hizo alguna pregunta con relación a esa masa?

R: No creo.

P: ¿Cómo usted se sintió cuando le dijeron que tenía una masa cerca del ovario derecho?

R: Bueno, yo estaba preocupada.

P: Ajá. ¿Qué usted interpretó por eso?

R: ¿Preocupada?

P: ¿Interpretó algo? No, no. Por el hecho de que le digan que tiene una masa en el ovario derecho.

R: Bueno, uno piensa seguida si es un cáncer.

P: Si es un cáncer, bien. ¿Usted le preguntó al doctor Hernández sobre eso?

R: No.

P: ¿No le preguntó?

R: No.

P: Y tenía esa preocupación, ¿no?

R: Sí.

P: ¿Y por qué razón no le preguntó, si tenía la preocupación?

R: No se lo pregunté.

P: Yo sé que no se lo preguntó porque usted me lo está diciendo, pero yo le estoy preguntando, por qué razón no se lo preguntó si tenía esa preocupación de que pudiera ser un cáncer. ¿No le preguntó?

R: No, no le pregunté.

P: ¿Y no sabe por qué razón tampoco?

R: No. No se lo pregunté.

P: No se lo preguntó. El doctor Hernández le indicó a usted, ¿qué tipo de procedimiento él entendía que se debía llevar a cabo en este caso?

R: Bueno, *él me informó a mí que él me iba a operar para sacarme el ovario derecho y esa masa que reflejaba el sonograma al lado del ovario derecho.*

P: ¿Le indicó, en algún momento o le mencionó el término operación exploratoria? Para explorarle ese ovario derecho, para explorarle esa región del vientre o del abdomen.

R: Si mencionó ese término o no para mí ya él me había dicho que me iba a sacar el ovario derecho y la masa.

P: Ajá.

R: Digo, ya usted sabe lo que va a sacar.

P: ¿Y eso fue en esta ocasión?

R: Sí, señor.

P: Bien. ¿Le dijo a usted el doctor Hernández qué era lo que él creía que usted tenía? ¿Cuál era la condición de la que usted padecía? ¿Qué razón le dio para recomendarle, si es que se lo recomendó, que usted se sometiera a una intervención quirúrgica para tratar de resolver el problema que presentaba esa masa en el ovario derecho?

R: Yo no recuerdo.

P: No lo recuerda.

R: No lo recuerdo.

P: *¿Usted le preguntó al doctor Hernández en qué consistía esa operación, en algún momento o sencillamente no se lo preguntó tampoco?*

R: ¿En qué consistía la operación?

P: *La operación, cómo se llevaba a cabo la operación y qué se hacía y qué era lo que iba a hacer.*

R: Bueno, es que *volvemos a lo mismo porque él ya me había dicho que me iba a sacar el ovario y la masa. Qué procedimiento usa, pues mire, yo no sé.*

P: Unjú. ¿Usted no le preguntó nada con relación al procedimiento?

R: *No.*

P: ¿Le preguntó algo con relación a los *riesgos* de la operación?

R: *Tampoco.*

P: ¿Le preguntó algo con relación a la alternativa que usted tenía para operarse o no operarse o usted entendía que se tenía que operar?

R: Sí, si no ese mes de julio, él me había dicho que la operación venía bien fuera dentro de tres, cuatro, cinco meses.

P: Y usted estaba de acuerdo en que se tenía que operar.

R: *Sí, señor.*

P: *¿Entonces, no le preguntó cuáles eran esos riesgos?*

R: *Ni él me los dijo tampoco.*

P: Pero mi pregunta es si usted se lo preguntó.

R: No, señor. (Énfasis suplido.) T.E. I, págs. 106–109.

Por otro lado, el testimonio del doctor Hernández arroja poca luz sobre qué le informó para obtener su consenti-

miento. Únicamente tenemos las respuestas a las preguntas de su abogado sobre la recomendación que le hiciera a la demandante recurrente Rodríguez Crespo de *acelerar* su decisión:

> P: Doctor, le pregunto yo si como resultado de haber estudiado estos hallazgos de los exámenes que usted ha descrito ante el Honorable Tribunal, usted le hizo alguna recomendación a doña María Teresa.
>
> R: Sí, ya antes cuando ella vino la primera vez, definitivamente comentamos sobre la posibilidad de cirugía. La única cirugía que se le podría hacer a doña María Teresa en beneficio era considerar sacar el ovario y el tubo que le quedaba, ¿por qué?, porque había que tratar tres (3) cosas a la vez. Había que tratar su dolor, dolor que corresponde a que un ovario funcionando ahí adentro y que está . . . está presionado, pues, los quistes crecen, se forman foliquísticos y duele y si no . . . y si siguen creciendo, sigue doliendo. No se quita el dolor con analgésicos. Segundo, había que tratar su incapacidad sexual, porque . . . este . . . todos necesitamos estar en perfectas condiciones en muchos momentos de nuestra vida. Y tercero, había que tratar la posibilidad de una masa que fuese cancerosa en un momento dado. Y el 3% del 14 que se presentan, pues, lo són [sic]. Así que eso se le dijo. La posibilidad se le dijo en la primera visita, se reafirmó el diagnóstico en su segunda visita y la cirugía iba, sin lugar a dudas, sin lugar a dudas esta señora no tenía otra alternativa. Los pro y los en contra se discutieron con ella, pero esa era la alternativa o quedarse con eso ahí y a Papá Dios que reparta suerte.
>
> P: Bien. ¿Usted desde el punto de vista de la mejor práctica de la medicina tomó la determinación, luego de discutirlo con el paciente, de que en este caso se requería una intervención?
>
> R: Es correcto. T.E. II, págs. 135–136.

Al preguntar a la señora Rodríguez Crespo sobre cómo hubiese reaccionado de haber sido advertida de que la operación podría traer como consecuencia la pérdida de un riñón, respondió:

> R: No me hubiese sometido a una operación hasta tanto tener opiniones de otros médicos.

P: ¿Qué habría hecho?

R: Buscar opiniones de otro ginecólogo, inclusive hasta el urólogo, si es que se me iba a afectar una cosa por una operación de ovarios. Mire, yo en ese momento no me someto a la operación hasta tener otras opiniones. T.E. I, pág. 167.

De estos testimonios, incluso el del propio doctor Hernández —corroborado por la demandante recurrente Rodríguez Crespo— surge que aquél sólo le informó su diagnóstico y discutió las alternativas que tenía ésta para curar su enfermedad. Sin embargo, dicho galeno no controvirtió la declaración de ella en cuanto a que *no le informó sobre los riesgos de la operación.* Aunque afirmativamente se estableció que ella no le preguntó sobre los riesgos, según hemos expuesto, tal deber no es del paciente sino del médico. Brau Del Toro y Marcial Rojas, *supra*, pág. 157. En estas circunstancias, resulta obvio que la determinación del foro de instancia no puede sostenerse. El consentimiento no fue informado. Aparte de la negligencia, la lesión al uréter que eventualmente exigió que se extirpara el riñón derecho, órgano vital de la señora Rodríguez Crespo, genera responsabilidad médica por no haber mediado consentimiento ilustrado al faltar al deber de informar adecuadamente a su paciente.

## V

Para ultimar, nos preocupa la visión restrictiva que endosa la mayoría del Tribunal[5] en cuanto al acceso y utiliza-

---

[5] La opinión mayoritaria al respecto expone:

"Al cumplir con nuestra función revisora en casos de impericia médica, nuestra decisión debe estar fundada en la prueba vertida en el juicio por los peritos y en la prueba documental. En ausencia de prueba no es nuestra función establecer a este nivel apelativo los elementos requeridos por el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141. De lo contrario, cedemos a la tentación de sustituir el criterio de los peritos médicos por el nuestro a base de un estudio apelativo de la

ción de tratados médicos y literatura de medicina forense al evaluar casos de esta naturaleza. Rechazamos ese enfoque limitativo de revisión judicial.

En primer lugar, tales tratados y revistas citadas en este caso son autoridades confiables avaladas no sólo por el prestigio de sus autores, sino por su aceptación generalizada entre la comunidad médica para la fecha en que ocurrieron los hechos. Como tales, son susceptibles de *conocimiento judicial*, máxime si aspiramos a pautar normas de excelencia al adjudicar este tipo de acción.

A tal efecto, la Regla 11 de Evidencia, 32 L.P.R.A. Ap. IV, en lo pertinente, establece que:

> (A) *Los tribunales* podrán tomar conocimiento judicial de hechos que no son razonablemente objeto de controversia por:
> (1) Ser de conocimiento general dentro de la jurisdicción territorial del tribunal, *o*
> (2) *ser susceptibles de determinación inmediata y exacta recurriendo a fuentes cuya exactitud no puede ser razonablemente cuestionada.* (Énfasis suplido.)

El texto de esta regla provee dos (2) dimensiones. Así lo acredita el carácter disyuntivo de la conjunción "o". A su amparo, el juzgador de instancia y *este Foro apelativo* estamos en posición de tomar conocimiento judicial de hechos que "no tienen que ser de conocimiento general; pudiera tratarse de un hecho que casi nadie conoce. Lo esencial es que pueda averiguarse indubitadamente, con prontitud y precisión, acudiendo a fuentes de incuestionable confiabilidad". E.L. Chiesa, *Práctica Procesal Puertorriqueña, Evidencia*, San Juan, Pubs. J.T.S., 1983, Vol. I, Cap. II, pág. 28.

Segundo, esta regla recoge la casuística anteriormente pautada en *Colón v. San Patricio Corporation*, 81 D.P.R. 242, 273 (1959), sobre información que puede "ser objeto de

---

literatura disponible." Opinión mayoritaria, pág. 649. Véase, además, el voto explicativo de conformidad del Juez Asociado Señor Rebollo López.

exacta e inmediata demostración recurriendo a fuentes de fácil acceso y de indisputable precisión . . .".

Su extensión al campo adjudicativo, en particular a casos de mala práctica médica, es incuestionable. Se trata de una norma familiar, ampliamente aceptada en ésta y otras jurisdicciones, amén de un fundamento más valorativo apuntalado en el elemento de notoriedad sobre principios básicos y universales, científicos y anatómicos. E.W. Cleary, *McCormick's Handbook of the Law of Evidence*, 2da ed., Minnesota, Ed. West Pubs., 1972, pág. 763.

Nuestra función apelativa debe descargarse a tono con esa facultad y en armonía con el espíritu liberal de la Regla 65(R) de Evidencia, 32 L.P.R.A. Ap. IV. Chiesa, *op. cit.*, págs. 430-431. Máxime ante la dificultad y renuencia natural y tradicional prevaleciente entre la profesión médica de prestar testimonio pericial contra sus compañeros. Si se reconoce esta psicodinámica de clase, ¿por qué entonces descartar ese enfoque? Después de todo, la vara es una igual que, aplicada neutralmente, beneficia o perjudica —en atención a las circunstancias de cada caso— tanto al reclamante como al médico demandado. Las instancias en que su aplicación no favorezca a este último no la hacen desafortunada ni peligrosa. Menos desvirtúa su corrección evidenciaria y esencia jurídica.

Es un axioma elemental que para juzgar hay que conocer. "La realidad del mundo y la naturaleza humana son muy complejas. Frecuentemente los tribunales somos llamados a dirimir controversias sobre problemas técnicos, con algunos de los cuales estamos poco familiarizados. En tales situaciones, mediante el estudio de las distintas fuentes accesibles del saber, ampliamos nuestros conocimientos y, aplicando la experiencia judicial y el sentido común, tratamos de lograr una prudente apreciación de lo razonable y arribar a un resultado justiciero." *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719, 721 (1983). Resolver inteligentemente y

con justicia sólo es posible si, mediante el estudio y reflexión, ampliamos y adquirimos unos conocimientos mínimos en torno a las materias en controversia. El enfoque no es nuevo. Múltiples decisiones del pasado han sido adjudicadas por este Foro utilizando textos, revistas y otra literatura *médica* fundamental, *coetáneo y concomitante a la época del tratamiento que dio margen a tales causas de acción*. Han estado siempre disponibles a la profesión médica, a la clase togada y judicatura en las distintas bibliotecas de las escuelas de medicina, facultades de derecho, Tribunal Supremo y otras del país. Al acudir a éstas, en la etapa y análisis de la negligencia, en el descargo de nuestra función judicial nos hemos adherido estricta y escrupulosamente a esa metodología. Bajo este prisma es que hemos evaluado el presente recurso, acopiando en la fase técnica de tratamiento y cirugía —al decir de los propios demandados recurridos doctor Hernández *et al.*— el conocimiento directo e indirecto de materias dimanantes de aquella "literatura médica [que] describ[ía] muchos casos de obstrucciones ureterales; como la ocurrida en este caso . . .". Sentencia, pág. 2.

Como dijimos en *Ríos Ruiz v. Mark*, 119 D.P.R. 816, 829–830 (1987), otra vez lamentablemente:

> . . . el Tribunal se aparta del tradicional análisis jurídico de que son objeto estos casos, y la evaluación separada y crítica que presupone todo testimonio pericial a la luz de los textos básicos reconocidos y de fácil acceso en la medicina. *Valldejuli Rodríguez v. A.A.A.*, 99 D.P.R. 917, 923–924 (1971); *Morales v. Hosp. Matilde Brenes*, 102 D.P.R. 188 (1974); *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719 (1983); *Fernández v. Hosp. Gen. San Carlos, Inc.*, 113 D.P.R. 761, 767 (1983); *Crespo v. H.R. Psychiatric Hosp., Inc.*, 114 D.P.R. 796, 802–806 (1983); *Núñez v. Cintrón*, 115 D.P.R. 598, 606–609, 618 (1984); *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721, 731, 735–736 (1984); *Lozada v. E.L.A.*, 116 D.P.R. 202, 209–210 (1985).

> Esta visión del papel del Tribunal, aunque pretenda negarse, implica una renuncia a la función judicial de examinar y

aquilatar el valor probatorio de la prueba pericial desfilada — *López* v. *Hosp. Presbiteriano, Inc.*, 107 D.P.R. 197, 204 (1978)— en particular los conflictos entre autoridades opuestas sobre controversias periciales médicas. *Cruz* v. *Centro Médico de P.R.*, supra, pág. 721.

Si bien son los médicos los profesionales que ejercen la medicina, somos los tribunales —a través del conocimiento, la normativa jurídica y la estimativa psicojudicial— los llamados a resolver las controversias de pacientes que alegan mala práctica.

La "profecía" a que aludimos en *Ríos Ruiz v. Mark*, supra, y *Pérez Torres v. Dr. Bladuell Ramos*, 120 D.P.R. 295 (1988), *se ha CUMPLIDO*. Revocaríamos y devolveríamos los autos originales al foro de instancia para trámites relacionados con la indemnización.

—O—

Voto explicativo de conformidad emitido por el Juez Asociado Señor Rebollo López.

Estamos conformes con la Opinión del Tribunal. Ello, básicamente, por cuanto la misma arriba al resultado que, dados los hechos particulares del caso, entendemos correcto y por razón de que dicha ponencia, en términos generales, recoge nuestra posición respecto a la utilización de textos de medicina a nivel apelativo; esto es, la interpretación de la Regla 65(R) de Evidencia de 1979 (32 L.P.R.A. Ap. IV). Interesamos, sin embargo, hacer unas expresiones adicionales al respecto.

I

En cuanto a lo primero, suscribimos el criterio mayoritario a los efectos de que no existe en el récord prueba suficiente demostrativa de que el codemandado doctor Hernández incurriera en negligencia en relación con el tratamiento

y atención médica que le brindara a la codemandante Rodríguez Crespo antes de, durante y con posterioridad a, la intervención quirúrgica a que la sometiera.

Como expresáramos en *Pérez Torres v. Bladuell Ramos*, 120 D.P.R. 295, 297–298 (1988), "[l]as acciones por alegada impericia médica constituyen o representan un *reto especial* para los jueces. *Dichos casos siempre versan sobre la ocurrencia de un daño*; uno que, por lo general, resulta impresionante y doloroso. No obstante el natural sentimiento de compasión que todo ser humano experimenta al enfrentarse al daño y sufrimiento de otro ser humano, *los jueces tenemos que mantener siempre presente que el mero hecho de que haya ocurrido un daño no significa que el médico es civilmente responsable por el mismo*". (Énfasis suplido.)

Somos del criterio que, en ocasiones, en el pasado le hemos exigido demasiado a los facultativos médicos; mucho más de lo que le exigimos a otros profesionales, incluso a lo que nos exigimos a nosotros mismos. De hecho, podría quizás hasta decirse que este Tribunal, ante el daño sufrido por el paciente de un médico, en ocasiones ha dado la impresión que éste tiene que ser perfecto, que no puede cometer errores en el desempeño de su delicada y difícil función.

Existe una gran diferencia entre un patrón de atención médica negligente o un acto de impericia médica, y la comisión de un error, honesto e informado, de parte de un facultativo médico en el tratamiento de un paciente. El presente caso resulta ser un buen ejemplo de ello. Aun aceptando, a los fines de la argumentación, como correcta la teoría de la parte demandante —esto es, que el doctor Hernández, en el transcurso de la intervención quirúrgica, interesó el uréter de la paciente Rodríguez Crespo con un punto de sutura— somos del criterio que no existe responsabilidad civil por parte del referido galeno. Debe recordarse que dicho procedimiento de sutura se hizo necesario cuando le sobrevino a la paciente una hemorragia en el transcurso de la operación.

Ante la emergencia, el doctor Hernández realizó la acción procedente e indicada: tomó unos puntos de sutura con el propósito de ponerle fin al sangramiento.

Asumamos que efectivamente el doctor Hernández interesó el uréter de la mencionada codemandante: ¿Es ello prueba concluyente de que actuó negligentemente y de que debe responder civilmente ante la mencionada codemandante? Entendemos y sostenemos, a la luz de la prueba desfilada ante el foro de instancia, que no. Ese hecho meramente constituye evidencia de que el cirujano cometió un error o equivocación mientras le brindaba a su paciente, en el transcurso de una emergencia, el tratamiento y atención que, a la luz de los modernos medios de comunicación y enseñanza, satisfacen las exigencias profesionales generalmente reconocidas por la propia profesión médica. *Oliveros v. Abréu*, 101 D.P.R. 209, 226 (1973).

No le podemos exigir, repetimos, perfección a la clase médica. Sería sumamente injusto que así lo hiciéramos. Pensemos en nuestra propia función: de ordinario, se nos someten controversias, las cuales resolvemos luego de tener tiempo de estudiarlas y analizarlas; aun así, muchos piensan y sostienen, a veces con razón, que nos hemos equivocado. Los médicos, como seres humanos que son, también tienen "derecho" a equivocarse.

## II

En relación con la utilización de textos de medicina por parte de este Tribunal en apoyo de las decisiones que emitimos, somos de la opinión que en el pasado, en ocasiones, igualmente nos hemos excedido.

Como es sabido, la Regla 65(R) de Evidencia, *supra*, establece, en lo pertinente, que:

Es admisible como excepción a la regla de prueba de referencia aunque el declarante esté disponible como testigo:

(R) *Tratados*: Declaraciones contenidas en un tratado, revista o folleto, u otra publicación similar, sobre un tema histórico, médico, científico, técnico o artístico siempre que se establezca, mediante conocimiento judicial o testimonio pericial, que la publicación constituye una autoridad confiable sobre el asunto.

Al respecto, expresa el profesor Chiesa,[1] en lo pertinente, que:

Aunque no se cuestiona que las declaraciones contenidas en los tratados son, para ciertos fines y con algunas limitaciones, admisibles en evidencia, dichos fines y limitaciones sí son objeto de grandes debates. La regla mayoritaria, aunque objeto de severa crítica, sigue siendo que los tratados no son admisibles como evidencia sustantiva aunque sí son admisibles a los fines de impugnación de testimonio pericial. *La regla minoritaria —que es la adoptada en este inciso— sostiene que las declaraciones contenidas en este tipo de obras son admisibles como excepción a la regla de prueba de referencia.* Tal excepción se justifica por la imparcialidad inherente a una obra escrita básicamente para profesionales o con fines docentes. Otro factor de gran confiabilidad es que estando dichas obras sujetas al juicio crítico de las autoridades en la materia, la reputación y el prestigio del autor están en juego, lo que hace improbable que éste no se preocupe por que todo lo que escribe sea, en la medida de lo posible, correcto o exacto.

Pero, por otro lado, independientemente de la confiabilidad de la obra, *existe la posibilidad —para algunos la probabilidad— de que la obra sea "malentendida" en ausencia de ayuda pericial; al menos se cree que, sin la ayuda pericial, es probable que las afirmaciones contenidas en el tratado sean erróneamente aplicadas a los hechos.* De ahí que la regla federal 803(18) limita el uso de tratados como evidencia sustantiva a situaciones en las que un perito está testificando; ello garantiza la disponibilidad del perito para contestar pre-

---

[1] E.L. Chiesa, *Práctica Procesal Puertorriqueña, Evidencia*, San Juan, Pubs. J.T.S., 1985, Vol. I, Cap. VIII, págs. 430–431.

guntas en cuanto al significado o aplicación del contenido del tratado. Por las mismas razones, se dispone en la regla federal que, de ser admisibles, las declaraciones pueden ser leídas en evidencia pero no pueden ser recibidas como *exhibits*.

*Nuestra regla no tiene estas limitaciones. Podemos hacer conjeturas sobre el porqué de una regla tan liberal.*

En primer lugar, de ordinario los costos del peritaje resultan considerables. Una parte puede tener un buen caso pero no contar con recursos suficientes para contratar un perito. Un abogado, bien preparado y con la ayuda de un buen tratado, podría establecer su caso a través de declaraciones contenidas en la obra, sin necesidad de perito. El tribunal siempre puede nombrar sus propios peritos para asegurarse de la comprensión más cabal del asunto. En segundo término, la limitación de que no se admita la obra en evidencia es contraria a la realidad de lo que ocurre fuera de la sala. El juez, por su cuenta, consulta los tratados, estén o no éstos admitidos en evidencia.

El uso de tratados es crucial para el contrainterrogatorio de peritos. El abogado que no cuenta con un perito, cuando se enfrenta al perito de la parte contraria, descansa básicamente en el uso de tratados para contrainterrogar eficazmente al perito. Sin embargo, existe una regla restrictiva en virtud de la cual, para contrainterrogar a un perito por medio de un tratado, el perito debe haber expresamente descansado en dicho tratado en su examen directo. La regla liberal permite el uso de tratados para contrainterrogar a un perito independientemente de que éste hiciera referencia a dicho tratado en el examen directo, siempre que se establezca que la obra constituye una autoridad confiable sobre el asunto en controversia. Este es el enfoque de nuestra regla. Sobre este asunto, véanse Annot. 60 A.L.R. 2d 77, y *Reilly* v. *Pinkus*, 338 U.S. 269 (1949), y *McCormick*, Sec. 321.

*En suma, nuestra regla es completamente liberal. En primer lugar, se admiten como evidencia sustantiva las declaraciones contenidas en tratados aunque no esté declarando como perito testigo alguno. Y en segundo lugar, a los fines del uso del tratado cuando declara un perito, no se requiere que éste se refiera al tratado en su examen directo, ni que haya sido contrainterrogado a base de declaraciones en el tratado.*

Bajo nuestra ley anterior eran admisibles en evidencia las obras históricas, libros de ciencia y artes, y mapas o cartas publicados, cuyos autores nada tuvieren que ver con las partes, como evidencia *prima facie* respecto a hechos de general notoriedad e interés. 32 L.P.R.A. sec. 1827.

.          .          .          .          .          .          .          .

En rigor, no existe jurisprudencia en Puerto Rico sobre esta materia, con excepción de los señalamientos en *Colón* v. *Shell Co.*, 55 D.P.R. 592, 614 (1939), en donde se cita con aprobación a Wigmore en relación con el valor probatorio de las obras científicas.

*Debe señalarse que esta regla es de particular significación en relación a testimonio pericial médico, en virtud del uso frecuente de tratados de medicina ante nuestros tribunales.* En relación a textos de medicina, véanse *Thomas* v. *American Cystoscope Makers Inc.*, 414 F.Supp. 255 (1976), y *Apicella* v. *McNeill Laboratories Inc.*, 66 F.R.D. 78 (1975). (Énfasis suplido y escolio omitido.)

Como podemos notar —y en lo pertinente al presente caso— en nuestra jurisdicción rige la regla liberal, y minoritaria, que permite la utilización del contenido de textos de medicina no sólo en el contrainterrogatorio de los peritos médicos de la otra parte, sino que, *y aún más importante*, dicho contenido es admisible en evidencia como prueba sustantiva, aun cuando no se presente como testigo a perito alguno. Ello, en la práctica, ha resultado muy provechoso para la profesión y para nuestro pueblo en general. La experiencia demuestra que, de ordinario, resulta sumamente difícil para un demandante y su abogado conseguir que facultativos médicos accedan a declarar como peritos en contra de un compañero de profesión que es demandado en un pleito sobre mala práctica de la medicina.

Lo permitido por la citada Regla 65(R) de Evidencia, *supra*, en realidad no representa peligro ni problema alguno *a nivel del tribunal de primera instancia*. La parte "afectada" por el contenido de dichos textos de medicina —ya con conocimiento previo, resultado de la utilización de los proce-

dimientos de descubrimiento de prueba, de lo que se propone hacer la otra parte— puede prepararse adecuadamente para presentar *durante el juicio* testigos peritos que refuten el contenido de dichos textos o, incluso, otros libros de textos que sostengan lo contrario. En resumen, somos de la opinión que la citada Regla 65(R) de Evidencia, *supra*, tuvo, y tiene, el propósito de permitir *la utilización de estos textos* —ya como prueba sustantiva, ya para impugnar a un testigo— *durante la celebración del juicio a nivel de instancia,* por cuanto a dicho nivel ninguna parte está en desventaja por ello respecto a la otra, por razón de que ambas tienen la oportunidad de refutar el contenido de dichos libros con otra evidencia.

La situación, sin embargo, es otra cuando es el tribunal apelativo el que utiliza el contenido de textos de medicina que no han sido objeto de análisis por las partes a nivel de instancia en apoyo de la decisión que emite, práctica en que, desafortunadamente, este Tribunal ha incurrido con alguna frecuencia en los últimos años. En primer lugar, y como señala el profesor Chiesa, existe la gran probabilidad de que la obra sea mal interpretada por los Jueces de este Tribunal, los cuales, después de todo, somos legos en la materia. En segundo lugar, dicha práctica resulta injusta con la parte afectada por la utilización de dichos textos, ya que ésta no tiene la oportunidad de refutar el contenido de los mismos. En tercer lugar, se puede incurrir en un grave error de derecho si, en la solución del caso a nivel apelativo, se utilizan textos de medicina "modernos", esto es, vigentes a la fecha de la decisión, y no aquellos que son contemporáneos a la fecha de la comisión del alegado acto de impericia médica. No debe perderse de vista que, cuando el caso es finalmente resuelto por este Tribunal, de ordinario, ya han transcurrido varios años desde la comisión de la alegada impericia. De utilizarse textos de medicina recientes, se estaría juzgando

al médico a base de técnicas y adelantos profesionales que, a la fecha en que trató al paciente, no eran conocidas.

Lo anteriormente expresado no debe ser interpretado como que sostenemos que este Tribunal está impedido en forma absoluta de utilizar el contenido de textos de medicina en apoyo de las decisiones que emite en casos de alegada impericia médica. No hay duda de que poseemos facultad inherente para así hacerlo. Debemos, sin embargo, evitarlo en lo posible, limitando la utilización de dicho mecanismo adjudicativo a situaciones en que no haya posibilidad de mala interpretación y aplicación, por parte nuestra, del contenido de esos textos, a casos en que no haya otra alternativa decisional y, sobre todo, utilizando únicamente aquellos textos de medicina que sean contemporáneos a la fecha de los hechos.

La utilización indiscriminada de ese mecanismo, repetimos, es sumamente delicada y peligrosa. Su uso requiere la mayor prudencia por parte de este Tribunal. Nuestra función debe limitarse, en lo posible, a resolver los recursos radicados a base de la evidencia que presentan las partes a nivel de instancia. Después de todo, se le debe dejar la práctica de la medicina a los que están autorizados para ejercerla: los médicos.

En el presente caso, ningún texto de medicina utilizado por las partes a nivel de instancia o citado como autoridad en las opiniones mayoritaria o disidente, constituye base suficiente en derecho para sostener que el codemandado, Dr. César Hernández, incurrió en responsabilidad civil en relación con la intervención quirúrgica a que sometiera a la codemandante Rodríguez Crespo.

Por las razones antes expresadas es que suscribrimos y endosamos la opinión mayoritaria emitida en el presente caso.